**VINSON v. STATE.**

4 Div. 501.

Court of Appeals of Alabama.

Feb. 27, 1940.

Rehearing Denied March 12, 1940.

E. O. Baldwin, of Andalusia, for appellant.

Thos. S. Lawson, Atty. Gen., and John J. Haynes, Asst. Atty. Gen., for the State.

BRICKEN, Presiding Judge.

From a judgment of conviction for the offense of manslaughter in the first degree, this appeal was taken.

Upon the trial of this case in the court below, numerous witnesses were examined. The evidence thus adduced is without material conflict and portrays a deplorable state of affairs, in that, the deceased was killed by his own brother; and that the deceased entertained bad feeling and ill will towards the defendant, and had upon separate former occasions threatened to kill the defendant.

The killing complained of happened in the yard at the home of defendant; the defendant at the time being engaged, with others in his employ, in sawing and splitting stove wood for sale, which the testimony shows was his avocation. While thus engaged at work, attending to his own affairs, the deceased, accompanied by his brother Tom Vinson, drove up in defendant's yard, alighted from the truck in which they were riding. These two men went at once to defendant's trailer which was in his back yard, and started to attach it to their truck for the purpose of carrying it away, whereupon defendant requested them to let the trailer alone and to please go on out of his yard, stating, "I do not want any trouble." At this juncture the deceased, Ennis Vinson, turned the trailer aloose and started for defendant and, all the testimony, both for the State and defendant, bearing directly upon the difficulty, showed that the deceased advanced upon defendant rapidly and called him several times a d—— yellow s— of a bitch, and stated to him he did not have the guts to shoot him. As to this, the defendant testified: "The trailer was my own property. My father had given it to me. Ennis or Tom did not have any interest in it at all. Ennis took hold of the trialer and said that he was going to take it, and I told him to go ahead out of my yard, I didn't want to have any trouble with him, and he began coming on to me and cursing me for a yellow son-of-a-

bitch and said I didn't have guts to shoot him. * * * I backed six or seven steps, and Ennis kept coming on to me cursing me. I backed to that oak tree. I told him to go on and leave me alone. I didn't want to have any trouble with him. I did not know what he had in his hand, but he had something. I was excited and couldn't tell what it was. I backed back because I was afraid of him, etc."

State witness, Webby Burnett, testified, among other things: "My name is Webby Burnett, and I live here in Andalusia. I know Mr. Tony Vinson, and knew Mr. Ennis Vinson in his lifetime. I recall the occasion when Mr. Ennis Vinson was shot. I was present at that time. It took place right there back of the house—Mr. Tony's house. * * * I know Mr. Tom Vinson and Mr. Ennis Vinson, and they come up there, they come up there on the truck and stopped. Both of them got off the truck and come over to the trailer. * * * They got out and went to the trailer. * * Tony Vinson was there with us too. * * He never did go towards the trailer, as he crosses over Ennis walked down toward him and he, Tony, backed up some. I don't know how many steps Tony backed up, about the distance from me to you—some five or six steps. * * * I heard Ennis say that he didn't have guts enough to shoot him and called him a yellow son-of-a-bitch. Before that Tony had not said anything to Ennis or Tom about the trailer, only just told him to go on and get off his place and not bother it. He told them to leave the trailer alone, and get off the place. * * * When Mr. Tony here, the defendant, walked up near where the trailer was, he told Mr. Tom and Mr. Ennis to get on off that he didn't want to have any trouble. Then Mr. Ennis, the boy that was shot, started down towards him and went to cursing him, and Mr. Tony backed on down toward that oak, down in the corner of the yard. When Mr. Tony backed off then they started to pick up the trailer. He told them again to leave it alone, and it was then that Mr. Ennis threw it down and started towards him— just cursing and called him a yellow son-of-a-bitch, and that he didn't have guts to shoot him. Mr. Ennis kept walking towards Mr. Tony, and he got within a step or a little more to Mr. Tony, still going toward him, cursing him, and Mr. Tony backed up against that tree standing in the corner. When he backed up against the tree he stepped aside and backed off a

little bit beyond it, and Mr. Ennis kept going towards him, still cursing him for a yellow son-of-a-bitch and telling him he didn't have guts to shoot him. I was standing over behind that wood yard, and I couldn't tell what he had in his hand. Mr. Ennis didn't fall after he was shot. After Mr. Tom moved him I went over there, and found this crank shaft lying where he was shot. I don't know whether he had it in his hand as he was walking towards Mr. Tony or not. I couldn't tell from where I was. I couldn't exactly tell whether he had something in his hand or not, he had this hand on the off side from me, I couldn't see it at all. His right side was from me. He was going west as he was going towards Tony, and that's the hand that he was motioning while walking down toward him. I couldn't tell how he was motioning his hand for I couldn't see it from the wood pile. I was beyond the pile of stove wood by the tractor, and whether he had the crank or something else I don't know, but I do know as soon as he was shot Mr. Tom went and carried him off and then is when I found this crank. (The crank was introduced as an exhibit to the testimony of the witness)."

Charlie Ellis, likewise a State witness, testified practically to the same facts as did witness Burnett that the deceased repeatedly cursed defendant and called him a yellow son-of-a-bitch. He also testified after deceased's brother Tom carried him off he went immediately to where Ennis was standing when shot and saw the car crank lying on the ground.

Tom Vinson, who as stated, accompanied the deceased to where the fatal difficulty occurred, testified as a witness for the State, and said, "I don't know whether Ennis was drinking on that occasion or not. He rode with me over there, but I couldn't say that he was drinking, and I wouldn't say that he wasn't." The foregoing testimony of witness Tom Vinson was allowed without objection or exception. However, when defendant undertook to question his witness Aaron Fletcher, as to whether he saw deceased just immediately before the fatal difficulty drinking, the trial court upon objection by the State would not permit defendant to make inquiry along this line, and refused to let witness answer any questions in this connection.

■ We are of the opinion that defendant should have been allowed to make inquiry as to the condition of his assailant at the time of the difficulty. Generally, the condition, mental, and otherwise, of the principals of the alleged commission of the offense, is of the res gestae, and evidence thereof is admissible as tending to shed light upon the actions and conduct of the respective combatants. Spelce v. State, 20 Ala.App. 412, 103 So. 694; Evers v. State, 25 Ala.App. 537, 150 So. 172; Beaird v. State, 215 Ala. 27, 109 So. 161; Hembree v. State, 20 Ala.App. 181, 101 So. 221; Weems v. State, 222 Ala. 346, 132 So. 711.

■ The first State witness, Mrs. Ennis Vinson, should not have been permitted to testify, "My husband was murdered by his brother" (defendant). Such statement had no place upon the trial of this case. It was but the conclusion or opinion of the adverse witness; it invaded the province of the jury, and was highly prejudicial to the substantial rights of the accused. Here, however, error cannot be predicated upon this question as no objection was interposed to the unauthorized statement, nor was motion made by defendant to exclude same. There, the court's rulings not having been invoked, we cannot, as stated, place the trial court in error. Pilcher v. State, 16 Ala.App. 237, 77 So. 75.

On the trial the defendant offered the testimony of numerous witnesses which tended to show his good character for peace and quiet. This testimony was without conflict.

Without dispute, the whole evidence showed conclusively that the defendant was at his own home where, of course, he had the right to be.

■ The evidence likewise discloses conclusively that the deceased, upon that occasion, was not only a trespasser, but a belligerent one. The court, however, at no stage of the trial so charged the jury. No mention of such fact was made in the oral charge of the court and there was a total absence of instruction to the jury to that effect. The court declined to so instruct the jury, and refused to defendant a special written charge wherein the court was requested to so charge. The Attorney General in brief undertakes to justify this action of the court by insisting the charge was upon the effect of the evidence. Such insistence is untenable, and may not be sustained. The controlling statute itself is a complete answer to the proposition. Section 9507, Code 1923, provides: "The court may state to the jury the law of the

case, and may also state the evidence when the same is disputed, but shall not charge upon the effect of the testimony, *unless required to do so by one of the parties.*" (Italics supplied). It will be noted by the express terms of the statute, supra, the defendant had the right to require the court to charge upon the effect of the evidence. Moreover, as to the point under discussion, all the evidence adduced upon the trial of this case tended to show that deceased was a trespasser on the occasion, and where this is true, no conflict in the testimony upon the point, the court had the inherent power to so charge even if not required by one of the parties to do. In Goff et al. v. Sellers, 215 Ala. 489, 111 So. 210, 211, the court said: "Section 9507, Code 1923 (section 2274, Code 1852), declares that the court 'shall not charge upon the effect of the testimony, unless required to do so by one of the parties.' It has been held that this section 'was not intended to abridge the original, inherent power of the court to direct the attention of the jury to undisputed, admitted facts.' Dennis v. State, 112 Ala. 64, 20 So. 925; Tidwell v. State, 70 Ala. 33. And, 'when the record shows affirmatively that certain facts are clearly shown and not disputed—not made any part of the contention—then it is not error if they be assumed in the charge to be facts, and stated as such without hypothesis.' "

See, also, Bristow v. State, 24 Ala.App. 439, 136 So. 837.

■ We are of the opinion that the trial court, by its rulings, in two or three instances unduly abridged defendant's right to prove threats against him by deceased. The fact that testimony from other witnesses as to threats against him by deceased had been adduced would not preclude the right of defendant to show further threats, or repetition of threats, which had been testified to by other witnesses. Carter v. State, 191 Ala. 3, 67 So. 981.

■ In this case, as in all criminal cases, the accused was presumed to be innocent, and this presumption attended him throughout the trial as a matter of evidence, or until overcome by sufficient evidence to satisfy the jury beyond a reasonable doubt and to a moral certainty that the killing was unlawful under the law and as charged and contemplated in the indictment. Here, the accused was at his own home as, of course, he had the right to be. Being at his own home, he was under no duty to retreat, but, notwithstanding this, the undisputed evidence tends to show that he tried to do so. There is no evidence in this case which tends to show that the accused by word or act contributed in any manner in provoking or bringing on the difficulty which resulted in the death of deceased. Nor is there anything in the evidence tending to show that he fought willingly. The evidence is conclusive to the effect that he was in imminent danger of losing his life, or of suffering grievous bodily harm at the hands of deceased at the time he fired the fatal shot. All this, the evidence tends to show.

Appellant failed to avail himself of the usual beneficial motion for a new trial. From what has been said, the reversal of the judgment of conviction from which this appeal was taken must be had. It is so ordered.

Reversed and remanded.