44 So.2d 616

**CHAMPION v. STATE.**

5 Div. 271.

Court of Appeals of Alabama.

May 17, 1949.

Rehearing Denied June 21, 1949.

8

A. A. Carmichael, Atty. Gen., and Bernard F. Sykes, Asst. Atty. Gen., for the State.

J. B. Atkinson, Grady Reynolds and Reynolds & Reynolds, all of Clanton, for appellant.

HARWOOD, Judge.

This appellant was indicted for manslaughter in the first degree. His jury trial resulted in a verdict guilty of manslaughter in the second degree.

The evidence presented by the State tends to show that appellant was a police officer for the City of Clanton at the time of this homicide.

The deceased, a soldier stationed at Craig Field, Selma, Alabama, and his first cousin J. W. Bradley, and Bradley's brother-in-law, Marlin Ingram, had met together in Clanton on Sunday, February 17, 1947. They rode around in a taxi awhile, and then just walked around." Marlin had been drinking, and was probably drunk. The other two may have been drinking to some extent. At any rate, about 11:30 that night they went to Smitherman's Cafe in Clanton and ordered some tomato juice. Before they had been served the appellant approached their booth and asked to see what they had "set down." He then informed Ingram that he was drunk and had been disorderly and that he was going to take him to jail. Appellant and Ingram started out of the cafe. Near the front door Ingram pulled back to let some other patrons enter and appellant hit him a blow that knocked him into a nearby table. Appellant asked someone to call police headquarters and have a police car sent to the restaurant. He and Ingram then went out and stood in front of the cafe, where they were joined by Bradley and the deceased.

In a few minutes Officer Plowler arrived in a police car. Some difficulty was experienced in getting Ingram into the police car and appellant began beating him with a blackjack. According to some of the State's witnesses appellant struck Ingram a large number of blows. His head became bloody.

At this point the deceased protested appellant's actions and told him to stop as he had already nearly killed Ingram.

With this appellant turned on deceased and began hitting at him with his blackjack. Deceased backed away, attempting to protect his head with his arms. After appellant had thus backed deceased some distance the strap to the blackjack broke and fell to the sidewalk. Both appellant and deceased attempted to recover the blackjack, but appellant obtained it and put it in his pocket. He then pulled his pistol and shot the deceased.

The evidence for the defense was directed toward showing that the deceased, Ingram, and Bradley, or some of them, had been drunk and disorderly in and around the business section of Clanton previous to the homicide, and that Ingram was drunk at the time appellant took him out of the cafe. Appellant and Officer Plowler also gave testimony, which if believed under the required rule, tended to show that they were attacked by the deceased and his companions, and that the force they used was necessary to process the arrests they were attempting.

The picture sought to be shown by appellant's evidence is fairly well presented by the following excerpts from appellant's testimony:

"Q. All right. Go ahead. A. In putting Ingram in the car, why, we got him in there as much as twice I know, and them fellows would jerk him out. If they didn't, he would jerk—get out himself, crawl out, and the next time I gave him a pretty good little tap by the side of the head, and he staid in there from then on, he didn't never get out any more.

"Q. All right. A. And that is when me and Mr. Burt tied up out there, and he was going to break my God damn neck, he said.

"Q. What did Burt say to you, if anything? A. He said, 'You ain't going no' —He first asked me, 'What are you going to do with him?' I said, 'Why, I have already told you, I don't know how many times, I was going to take him to jail.' He said, 'For what?' I said, 'Because he is drunk and disorderly, and you know he is.' I said, 'Now, the thing for you to do, you boys, is to go on and leave us alone.' He said, 'No, you ain't going to take nobody to jail if you don't take us.' And I told him then, 'We don't want to take nobody but him,' that they weren't drunk. So then, about that time somebody, some fel-

low knocked Mr. Plowler down, I don't know who it was, and Burt was trying to hit me, and he hit me some times, but I couldn't get to hit him much because he was active, and he could hit me and jump way out yonder out of the way.

"Q. What did Burt say to you? A. I don't know. At times he said he was going to break my God damn neck. I don't know how many times he did say that. So I tried to reach him with my blackjack, or billy, rather. After I had tried to use the gas, and the thing wouldn't fire, it snapped, it wouldn't shoot, then I thought maybe—I told him then, 'Come on; let's go.' He said, 'I ain't going nowhere with you, you son-of-a-bitch.' And then I tried to hit him on the head with the blackjack, and I caught the straps like this, with my finger, to let it reach out over there, and it flew off. Well, it was north of the cafe, and Burt made a dive around over—bent over to get it, and I run against him and pushed him on over, and I picked it up and put it in my pocket. He went out a little piece, and turned and come back at me, and I told him not to come on me anymore; that I had give out. He said, 'I am going to break your damn neck, you son-of-a-bitch.' And I said, 'I am going to shoot you, too,' and that is what happened.

".Q. When he said that, what did he do? A. He jumped at me. He said he was going to break my God damn neck.

"Q. What part of him were you shooting at? A. Well, I was shooting, trying to hit right in here, to stop him, because he was pretty close to me, and I knew I couldn't—

"Mr. Huddleston: Just what happened, if your Honor please.

"Q. How far were you from him at the time you shot him? A. Well, it wasn't over about two or three feet, right at him; right close on me.

"Q. Where were you aiming at him? A. I was aiming at him right there (indicating), and if he hadn't squatted, to jump under my arm, or throat, I would have got him there."

Officer Plowler, a witness for the defense, testified that when he arrived at the scene appellant and deceased were standing in front of the restaurant. When Ingram was put in the police car he would be taken out by Bradley and the deceased. This happened more than once. This witness denied that he saw appellant ever strike Ingram with a blackjack, and stated that Ingram's head was injured when he hit it on the automobile getting into it. In this connection however the appellant himself testified that Ingram's head injuries were the result of blows which he, appellant, struck with his blackjack.

In Jeffries v. State, 23 Ala.App. 401, 126 So. 177, a case highly similar to the present one, this court held that where the evidence permits of no inference but that a killing is intentional, a verdict of guilty of manslaughter in the second degree is contrary to the evidence and under such circumstances it is error to refuse a defendant's motion for a new trial based on such ground.

In the course of the opinion in the Jeffries case, supra, it is stated that under such circumstances, i. e., proof of an intentional killing, allowance of a judgment of conviction of manslaughter in the second degree to stand "would be making a farce of the law."

We think the opposite is true, and that to reverse a judgment, and in effect free an accused because the case against him is overly supported by the evidence creates a result both tragical and farcical. .

This appellant was indicted for manslaughter in the first degree. Such charge of course included the lesser offense of manslaughter in the second degree, or involuntary manslaughter.

"Involuntary manslaughter has been defined to be the unlawful killing of a human being, without malice, either express or implied, and without intent to kill or inflict the injury causing death, committed accidentally in the commission of some unlawful act not felonious, *or in the improper or negligent performance of an act lawful in itself.* 6 Amer. & Eng. Encyc., p. 588." Johnson v. State, 94 Ala. 35, 10 So. 667, 669; Davis v. State, 31 Ala.App. 508,

19 So.2d 356; Carter v. State, 31 Ala.App. 526, 19 So.2d 361.

We think that this court ignored the underlined portion of the definition of manslaughter in the second degree in the Jeffries case, supra, especially since the homicide under consideration was committed by an officer processing an arrest, as in this case.

An officer may arrest any person without a warrant, on any day and at any time, for any public offense committed, or breach of the peace threatened in his presence. Sections 154, 155, Title 15, Code of Alabama 1940.

As to the right of an officer to kill in making an arrest, the rule is stated in Suell v. Derricott, 161 Ala. 259, at 270, 49 So. 895, 900, 23 L.R.A.,N.S., 996, 18 Ann.Cas. 636, as follows:

" 'Generally when one refuses to submit to arrest after he has been touched by the officer, or endeavors to break away after the arrest is effected, he may be lawfully killed, provided this extreme measure is necessary. In cases of felony the killing is justifiable before an actual arrest is made, where in no other way the escaping felon can be taken. In cases of felony, if the felon flee from justice, it is the duty of every man to use his best endeavor to prevent an escape, and if in the pursuit the felon be killed, where he cannot be otherwise overtaken, the homicide is justifiable, but if he may be taken in any case without such severity, it is at least manslaughter in him who kills him, and the jury ought to inquire whether it was done of necessity or not.' Justification, however, happening in cases of persons charged with misdemeanors or breaches of the peace, is subject to a different rule from that as to felony. Generally speaking, in misdemeanors, it will be murder to kill the party accused, when fleeing from arrest, though he cannot otherwise be taken; but under some circumstances it might be manslaughter, *if it appeared that death was not intended.*" (Italics ours).

In considering the law properly applicable to this case it must further be remembered that in all cases of attempted legal arrest an officer is under a duty to act aggressively and go forward in perfecting the arrest. He may repel force with force and need not give back. Williams v. State, 33 Ala.App. 304, 35 So.2d 562.

An officer properly is armed when on duty. When undertaking an arrest there is no question of a duty to retreat, indeed his duty is to go forward and perfect the arrest. He may use such force as is reasonably necessary. Under certain circumstances, such as violent resistance on the part of the law breaker, the use of firearms may be justified even though the attempted arrest is for a misdemeanor.

In this case the jury could well infer that the deceased had committed a breach of the peace in interfering with the arrest of Ingram. The appellant was therefore warranted in attempting to arrest deceased. Appellant's actions were lawful. Whether appellant, a police officer, properly used a pistol under the circumstances should be a matter of justification rather than depend on his intent to cause death with the firearm which he was properly carrying, and perhaps properly displayed to bring deceased under control.

Under appellant's testimony the deceased had put up a violent resistance to arrest. At the time appellant fired, deceased, according to appellant, was preparing to attack him with a threat to break appellant's neck. According to appellant the mortal location of deceased's wound resulted from the fact that deceased crouched for an attack just as he fired. Appellant's official capacity tends to negative malice and an intention to kill. We also think it must be conceded to appellant his right to display his gun for the purpose of overcoming deceased's resistance to arrest. His conduct became unlawful only if the full use of the firearm under the circumstances was improper and, if improper brought him directly within the involuntary manslaughter rule. Essentially, the question thus resolved itself into one of fact for the jury as to whether or not the officer, in performing an act lawful in its inception, acted in an improper manner and without due caution. Taylor v. State, 157 Tenn. 421, 7 S.W. 50. It is fair to assume that the jury adopted

this theory, and we are unwilling to say that the evidence clearly preponderates against this finding.

We have not overlooked in our consideration of this cause the doctrine of our cases to the effect that where the evidence produced by the State clearly establishes a consummated crime, and the defendant denies any participation therein, and seeks to establish an alibi, that a verdict of guilty of an attempt, or assault with intent, under such circumstances is improper, as indicating a compromise verdict. De Graaf v. State, Ala.App., 37 So.2d 130.[1] In such cases a defendant is either guilty of the crime charged, or he is innocent. He is entitled to be tried on the issues made by the evidence, and permitting a verdict which is patently a compromise might well tend to injure an accused. See the De Graaf case, supra, for a full discussion of this possibility.

On the other hand, in cases of the nature of the present one, the killing is not disputed, nor is the accused's participation therein.

The contention of appellant, relying on the Jeffries case, supra, is in effect that the verdict is contrary to the evidence because overly supported, and that rationally the verdict of the lesser degree cannot be supported. A mechanical syllogism may point to such result. Common sense denies the validity of such a specious conclusion.

Every killing is unlawful unless expressly excused, or justified by the law. A homicide being shown, it is incumbent upon the defendant to prove circumstances in mitigation, excuse, or justification, unless shown by the evidence produced against him. Harding v. State, 26 Ariz. 334, 225 P. 482. The degree of the mitigation, the validity of the excuse, or justification are questions for the jury. That a jury may attach some credence to the efforts of an accused to establish mitigation, excuse, or justification, though such efforts may seem trifling in light of the recorded evidence and render a verdict of a lesser degree of crime than could have been rendered under

one view of the evidence, does not, in our opinion, give an accused cause for complaint, where, as above stated, there is evidence tending to support the verdict, and it cannot be said to be manifestly a compromise verdict.

The rulings of the court were invoked relatively few times in the trial below. The rulings in each instance were patently correct and no discussion is indicated.

Appellant's counsel cites a number of cases from this court and from our Supreme Court in which it was held that refusal of the court to charge as to manslaughter in the second degree was correct in cases where the evidence shows that the killing was intentional. We do not think that the doctrine of these cases applicable to the question now under consideration. Other than the Jeffries case, supra, we find nothing in the decisions of this State precluding the conclusion herein reached. Insofar as the Jeffries case, supra, conflicts with this decision it is hereby overruled.

The trial court gave a full oral charge to the jury, and numerous written charges requested by the appellant.

Four written charges requested by appellant were denied without error inasmuch as two of the charges were not predicated on belief from the evidence, and the remaining two were either incorrect statements of the law governing, or were covered by the oral charge of the court or other charges correctly enunciating the principles sought to be stated in the refused charges, or so covered in the oral charge given the jury by the court.

Affirmed.

BRICKEN, Presiding Judge, not sitting.

On Rehearing.

HARWOOD, Judge.

We note that in the above opinion we failed to respond to appellant's contention that the lower court erred in refusing his motion for a new trial. We are unwilling to say that the lower court erred in its ruling in this premise.

---

[1]. 34 Ala.App. 137.

We further observe that part of the judgment of the lower court reads as follows:

"It is, therefore, considered by the Court and it is the judgment of the Court that the defendant be and he is hereby formally sentenced to hard labor for the use of Chilton County for a period of one year and that he pay a fine of $250.00.

"The defendant having failed to pay said fine or confess judgment therefor it is the order and judgment of the Court that said Defendant be sentenced to additional hard labor for Chilton County for a period of 90 days for the payment of the fine and 483 days for the payment of the Cost of these proceedings."

That part of the judgment above set out attempting to sentence the defendant to additional hard labor for 483 days for the payment of the cost is erroneous, in that under the provisions of Section 342, Title 15, Code of Alabama 1940, such additional hard labor to pay costs at the rate of 75¢ per day cannot exceed a period of ten months.

This cause must therefore be remanded for proper sentence in accordance with what has been said above.

Appellant's application for rehearing and motion that the opinion heretofore rendered be reversed and held for naught is denied, but this cause is hereby remanded for proper sentence in accordance with the terms of Section 342, supra.

Application denied, but cause remanded for proper sentence.

BRICKEN, Presiding Judge, not sitting.