204 So.2d 817

Joshua Samuel SHINE

v.

STATE.

3 Div. 202.

Court of Appeals of Alabama.

Nov. 28, 1967.

1. E. g., Cason v. State, 160 Tenn. 267, 23 S.W.2d 665; and Courtney v. State, 185 Tenn. 247, 205 S.W.2d 752.

Cates, J., dissented.

Chas. S. Conley, Montgomery, for appellant.

MacDonald Gallion, Atty. Gen., and J. S. Pinkston, Asst. Atty. Gen., for the State.

JOHNSON, Judge.

Appellant was convicted of murder in the second degree in the Circuit Court of Montgomery County, Alabama, and from a judgment imposing a sentence of fifteen years in the State penitentiary as punishment therefor, he makes this appeal.

On October 4, 1963, appellant was convicted in the Recorder's Court of the City of Montgomery of carrying a concealed weapon and sentenced to sixty days at hard labor. The Dean and Pettus Bonding Company (hereafter referred to as the Company) made an appeal bond from the City Court's conviction to the Circuit Court of Montgomery County in the amount of $200.00. It appears that after the appeal was taken sentence of sixty days at hard labor was changed by the court to a $100.-00 fine and court costs.

According to the testimony of both Mr. David Dean, Manager of the Company, and that of appellant, upon the occasion of the homicide which is the subject of this appeal, appellant owed the Company about $40.00 of the original amount of about $119.00 as payment for his fine.

Mr. Dean testified that the procedure which the Company followed in instances where the defendant had not paid his fine or had not appeared in court as required by law, was as follows:

"Well, this primarily is concerning the Recorder's Court where a person goes to Court and he is fined and does not have the money to pay the fine at that time. We write an appeal bond to the Circuit Court, and prior to the time that this case comes up in the Circuit Court, the defendant deposits the fine in our office to us and once he had deposited the whole fine, we pay the case off before it comes up in Circuit Court.

"Q. Now, suppose you make an appeal bond and he doesn't show up in Court. What steps do you take so that you can arrest him and get him into Court?

"A. Well, we obtain a certified copy of the bond from the Circuit Clerk and go and find the party and re-arrest him."

An allegedly certified copy of a bond dated July 1, 1964, was introduced into evidence. Appellant testified that at the time he signed the bond he did not know what he was signing and was told that his fine had been paid by the Company. He also testified that he did not know that the Company had arranged for him to take an appeal to the Circuit Court.

According to the testimony, on two occasions prior to July 2, 1964, Mr. Clifton Ruff (the deceased) and another man had attempted to "pick up" appellant and on both occasions appellant had evaded them. On another occasion Rufus Orum came to appellant's home and, according to appellant, "He told me they wanted to see me down at the office, and I had to go with him." However, appellant stated that he did not go because he had no money. On July 2, 1964, at about 5:00 A. M., David Dean, Mr. Ruff (the deceased) and Rufus Orum (a Negro) went to appellant's home in an attempt to apprehend him. Mr. Dean testified that he was carrying a 38 caliber pistol, deceased was armed with an 18½ inch barreled shotgun, and Rufus Orum was unarmed. More specifically, the testimony of Mr. Dean was as follows:

"Mr. Ruff and I got out on Hill Street and went through the back yards to the back part of the house. One went to the windows on the right hand side and I think I went to the back door. Rufus Orum drove to the front to knock on the door, the front door, to get him to the door. Samuel Shine came to the front door and Rufus called me and said, 'Mr. Dean, Sam is at the front door,' and so Mr. Ruff and I both came from the back and came to the front to talk to him or to bring him with us. I had a certified copy and I told him at that time that we had to go downtown to see about this fine, and that it was delinquent and that I was going to have to take him downtown, and Rufus told me that he wouldn't open the door and so I reached for the screen door, and it was latched, and it was latched very tightly. It wouldn't give at all. So, I told Joshua to open the door and come on with us, and he said, no, sir, I am not going now, and I stepped toward the door to pull it and he slammed the front door and locked it.

"Well, when this happened, I told Rufus to go to the back and I went to the back also and Mr. Ruff stayed at the front. Well, I went to the back door which is on the left hand side of the house and Rufus went to the right hand side by the windows, and I knocked on the back door and pushed on it and kicked at it. It was a little flimsy sort of door, but it was a solid wood door that had a lot of leverage to open it. I couldn't budge it. I had on leather shoes and there was dew on the porch and I almost slipped down and so I came to the front and told Mr. Ruff to go to the back door and I knocked on the front again and I called to him and I heard Rufus in the back say, Joshua, don't come out of the window. So, I stepped to the side of the porch—I stepped to the side looking down at the windows, and I saw him pushing the screen out to come out the side, and I called to him and I said, Joshua, come on and don't go out the window. I said, we are both here. So, Mr. Ruff at that time—well, I couldn't say what Mr. Ruff was doing

because I couldn't see him, but I started back across to the front of the house.

"Joshua obviously had left the window and I started across to the front porch and I heard a shot. I heard Mr. Ruff cry out—scream. I ran off the porch. I knew what had happened and I ran off the porch and started back to Mr. Ruff. At this time he was holding his stomach and was walking down the steps or staggering or falling off of the steps. He had a shotgun with him—a pistol type shotgun that he carried.

"Q. What do you mean by a pistol type shotgun?

"A. Well, it wasn't a pistol type. It had an 18½ inch barrel. It was a Model 12 pump with the stock cut off with a pistol grip."

Next, while in appellant's backyard, Mr. Dean fired several times into the house at appellant who was attempting to escape by way of the back door, and later did escape by way of the front door. Appellant was apprehended by police thirty-six hours later in Dothan, Alabama after an order for his arrest had been issued.

Appellant testified that on one of the visits made by employees of the Company prior to July 2, 1964, they had broken into his house and taken his shoes and flashlight. He stated that he spoke with members of the Company about the return of his property but it was never returned. On another occasion appellant stated that, while in the Company office to make a payment, he was offered a pair of old shoes in place of his own. The Company denied this.

The failure of the Company to return these personal items was one of the reasons given by appellant for his refusal to go with them on July 2. He also testified that while he was talking to Mr. Dean on the front porch just prior to the homicide "Mr. Ruff throwed the gun like he was going to shoot me and I slammed the door." In detail, appellant testified as follows:

"Q. What did you do after you shut the door?

"A. I run to the dresser. I run to the dresser and started trying to find some shells.

"Q. Then what did you do?

"A. I run to the back of the bed and got my gun.

"Q. Did you hear Mr. Dean knocking on the back door?

"A. I didn't hear him knocking.

"Q. Did you hear anybody at the back door?

"A. One busting the door open. Busting the door open. Bamm! Bamm! Bamm! Just like that until the door flew open. Busted open. When the door flew open, I shot.

"Q. Did you see anybody enter the room?

"A. I didn't see nobody. Ain't but one thing I seen. I seen the shotgun barrel when it was stuck in the door. When the shotgun barrel come in the door and the door flew open, I just shot. I didn't know whether I shot him or not, but I shot.

"Q. What did you do, Sam?

"A. I got away. I run. I run on out the front door. When the people started hollering and they were shooting the gun—that's when I run out. I run out right away.

"Q. Did you know who was at the back door?

"A. No, I didn't.

"Q. How many times did the person there hit the door?

"A. About five or six times.

"Q. You say you reached and got your gun, Sam. Why?

"A. Because I was scared."

In the following testimony, Mr. Dean stated that Mr. Ruff succeeded in breaking the door in.

"Q. Did you also hear Mr. Ruff banging on the back door trying to get in?

"A. Yes.

"Q. Approximately how long was he back there beating on the back door trying to break it in?

"A. He hit the door probably four or five times. He was pushing it with his shoulder.

"Q. In fact, he did succeed in breaking the door in, didn't he?

"A. Yes, he did."

■ Appellant made a motion to strike the jury venire drawn to try him and another motion to set aside the list of the venire and to also strike the twelve jurors selected to try him. The grounds of the two motions were that appellant was a Negro and that there was a systematic exclusion of Negroes from the jury panel. However, appellant offered no proof in support of these contentions and we will not further consider the grounds of the motions. Morris v. State, (Ala.) 39 So. 608 (Not reported in State reports). Drinkard v. State, 43 Ala.App. 294, 189 So.2d 583, cert. den. 280 Ala. 713, 189 So.2d 587.

■ Appellant also cited as error the introduction of a written statement taken by the police from him. As a predicate for introducing this statement, the State offered evidence that appellant was not "threatened or coerced in any way or offered any hope or promise of reward" and stated that he was asked if he desired counsel before this statement was made and advised that the statement would or could be used against him as evidence in a court of law. There is evidence tending to show that before appellant signed the statement it was read to him. We find no error in admitting this statement as it was largely corroborated by appellant's own testimony from the stand.

The question arises as to whether or not appellant was properly notified by the arresting officers of their authority to "arrest" him. Mr. Dean stated that he had a certified copy of appellant's bond and that appellant must "go downtown to see about this fine".

On cross-examination, Mr. Dean testified as follows:

"Q. When you got to the front, did you show the defendant a copy of this?

"A. I carry them in my right front pocket. I am sure I did. I just generally pull it out and say, I have a certified copy of a bond. Joshua, we have got a certified copy of a bond and we have got to go downtown and get this thing straightened out. I don't open it out and show it to him that way. I generally just—I carry it on my right hand side and I pull them out. I always do it.

"Q. Is it your testimony now that you did that on this occasion or that you just think you did that on this occasion?

"A. It is my testimony that I did.

"Q. You have an independent recollection of doing that on this occasion?

"A. No, I don't have an independent recollection, but I did it and I always do it. I would say that I did."

Rufus Orum testified as follows concerning this matter:

"I went to the front, and I was going to knock on the door and Shine was there and I called to him and I told him that Mr. Dean was around the house and wanted to see him and I told him he would have to go to the office and he said he wasn't going, and so I called to Mr. Dean and they come around the front and told him the same thing. * * *"

On cross-examination, Orum testified:

"Q. Now, on the morning that you and Mr. Dean and Mr. Ruff were out there talking to him and asking him to come on, I will ask you whether or not

Mr. Dean showed him or told him that he had a certified copy of the bond?

. "A. I just don't remember."

Appellant testified as follows concerning the certified copy of the bond?

"Q. Now, on July 2 when Rufus first came up on the porch, did he or did he not tell you that he had a certified copy of the bond?

"A. He didn't say nothing about no bond.

"Q. Did anybody on that occasion show you a certified copy of the bond?

"A. No, they didn't

"Q. Now, after Rufus and Mr. Dean and Mr. Ruff came around, what conversation took place between you and Mr. Dean?

"A. I started telling him about what he promised me my things back and I told him, I said, I am willing to pay you your money, I said, but don't you think I want my things just like you want your money, and I said, my things you all took out of my house are valued more than what I owe you."

The Company obviously bases its authority for the arrest of appellant under Code of Alabama, 1940, Tit. 15, Sec. 209, which states as follows:

"Bail may, at any time before a conditional judgment is rendered against them, exonerate themselves by surrendering the defendant; and for that purpose they may arrest the defendant on a certified copy of the undertaking at any place in the state, or may authorize another person to arrest him by an indorsement in writing on such copy."

On cross-examination, witness Dean stated that his Company could not endorse a copy of the bond to the sheriff, but that "he" had to arrest offenders. (Tr. 56). By the authority of Code of Alabama,

1940, Tit. 15, Sec. 209, this was manifestly incorrect. To make any kind of arrest, valid authorization and authority is requisite. Though Dean contends that a certified copy of appellant's bond was in his possession on the date in question, there is no positive evidence that it was ever shown to appellant or produced in his presence. Therefore, it is questionable that appellant had absolute knowledge by what authority this attempt to take him from his home was legally based. It is a vital part of an arrest for the accused to have notice of the authority under which he is being arrested as well as to know by whom he is being arrested. Even a police officer making a valid arrest must declare his intention and authority, unless, of course, his life is in such jeopardy as to preclude this notice. In this case there was certainly nothing found in the record which would lead this band of individuals, performing then and there as a "posse", to believe that appellant would come out shooting, or that their lives were in jeopardy at the time the certified copy of the bond should have been produced as their authority. A Kentucky court states in Cornett v. Commonwealth, 198 Ky. 236, 248 S.W. 540, that the killing of an officer who was attempting to make a legal arrest would be murder *"only if his character were known";* otherwise, the killing would only be manslaughter.

If any of the acts and statements of these three Company employees produced in appellant's mind a reasonable belief of imminent danger of great bodily harm to his life or limb, then such homicide could not be greater than first degree manslaughter if such resistance was not in enormous disproportion to the wrong and injury threatened. Brown v. State, 109 Ala. 70, 20 So. 103; Welch v. State, 28 Ala.App. 273, 183 So. 879; Catrett v. State, 31 Ala.App. 326, 16 So.2d 725, cert. den. 245 Ala. 336, 16 So.2d 727. Generally speaking, in misdemeanor arrests it would be murder to kill the accused when he is fleeing from arrest, even though he cannot be otherwise

taken. Holcomb v. State, 35 Ala.App. 528, 50 So.2d 165.

The following is stated in 5 Am.Jur.2d, Arrest, Sec. 83, p. 769:

"As a general rule, in the case of a misdemeanor, an officer has no right, except in self-defense, to shoot or kill the offender in attempting to arrest him. Accordingly, where one whom he seeks to arrest for misdemeanor flees, the officer is not justified in shooting, whether his purpose is to kill the fugitive or merely to check his flight, even if he cannot otherwise be taken."

Under the authority conferred upon the Company by Sec. 209, supra, the only valid purpose of the arrest would be to immediately deliver appellant into the custody of the Sheriff of Montgomery County.

"* * * [T]he sureties, instead of the officers of the law, become the custodians or keepers. Their dominion over the principal extends to a right, at any time, to arrest and surrender him again *to the custody of the law.*" State v. Esdale, 35 Ala.App. 27, 45 So.2d 861; cert. den. 253 Ala. 550, 45 So.2d 865.

"Surrender of the accused by bail should generally be made to the sheriff or deputy sheriff of the county where the case is pending, or to the court, if in session." 8 C.J.S. Bail § 87, p. 243.

"Under bail bond, the principal is committed to the custody of the surety, who is relieved of the undertaking by surrendering the principal into the custody of *sheriff of the county in which the principal is prosecuted at any time before forfeiture.*" (Emphasis ours.) State v. Eller, 218 N.C. 365, 11 S.E.2d 295; see also Pfeil v. State, 118 Tex.Cr.R. 124, 40 S.W.2d 120.

Here the evidence seems ambiguous and does not reveal that the sole purpose was to deliver appellant into the custody of the sheriff. The record reveals the following concerning the purpose of the arrest of appellant:

Rufus Orum: "* * * I called to him and I told him that Mr. Dean was around the house and wanted to see him and I told him he would have to go to the office and he said he wasn't going * * *"

Mr. Dean: "* * * I told him [appellant] at that time that we had to go downtown to see about this fine, and that it was delinquent and that I was going to have to take him downtown * * *"

Mr. Dean (on cross): "Joshua, we have got a certified copy of a bond and *we have got to go downtown and get this thing straightened out.*" (Emphasis ours.)

Appellant: "Mr. Ruff throwed the gun like he was going to shoot me and I slammed the door."

Appellant was required by law to submit himself to the custody of these individuals *only* if he were aware of and had been informed that the purpose of the "arrest" was to deliver him to the custody of the sheriff and that he would not be placed in danger of bodily harm. Brown v. State, supra. Had this been the case, the arrest would have been lawful and the homicide, murder. Ezzell v. State, 13 Ala.App. 156, 68 So. 578. However, this was not the case. There is no positive evidence that this authority was shown to appellant and the circumstances recited in the evidence indicate that the threats were so great as to put him in fear of bodily harm or of losing his life.

It is stated in Brown v. State, supra, that:

"In all cases of the killing of an officer, or of an assistant, in resistance of an arrest, a material inquiry, in determining the degree of the homicide, is, whether the party resisting had knowledge or notice of official character and of presence for the exercise of official authority."

Appellant, by staying in his home and refusing admittance to deceased and

the two men accompanying him, would not have been guilty of more than resisting their attempts to arrest him, and then only if such attempts were legal. We find no violence, from the evidence, until deceased broke in appellant's back door. Immediately prior to the homicide, deceased displayed to appellant an 18½ inch barreled shotgun. Mr. Dean was armed with a 38 caliber pistol. The use of weapons is unjustified when the attempted arrest is for a misdemeanor and the resistance is not violent. Champion v. State, 35 Ala.App. 7, 44 So. 2d 616, cert. den. 253 Ala. 436, 44 So.2d 622. Even though there is some evidence that appellant had twice before evaded the Company officials, there was nothing to indicate that any violence should be expected from him until the deceased, armed with a shotgun, broke in the back door of appellant's house, and such "show of force" on the part of the Company officials was unauthorized by law.

In Sir Edward Coke's "3 Law Tracts", 1764, the following is stated:

"This word Bail is * * * derived of the French word *Bailor,* which signifieth to deliver, because he that is bailed, is as it were delivered into the hands and custody of those that are his pledges and surities.

* * * * * *

"Bail * * * is when a man detained in prison for any offense, for which he is bailable * * * by law, is by a compleat judge or judges of that offense, upon sufficient surety found for his appearance and yielding of his body delivered out of prison.

* * * * * *

"First, he that findeth bail doth find surety only to answer that special matter."

The purpose and origin of the law of bail is ancient. The bail bond seems to have been popular in ancient Egypt. The reason was that a prisoner is bailed out "for economy's sake" as temporary servant to a citizen or official. The bond itself is merely a promise to produce the prisoner, after five days notice by the court, and in the meantime the prisoner is able to continue working. Wigmore, "A Panorama of the World's Legal Systems", Vol. 1, p. 24, 1928.

A bond from 250 B.C. of ancient Egypt is described in Wigmore's Vol. 1 and the *only* thing that is done by the bond is to aid in preserving "the economy". The only rights of the "bondsman" are to insure the prisoner's return to the court, upon notice, or lose his (the bondsman's) property in the prisoner's stead.

The Code of Alabama allows the bail to lawfully arrest that person for whom he stands as surety at any time before the forfeiture of the bond placed with the court by him, and to turn defendant over to the sheriff, thus relieving himself of the responsibility of being the surety of the defendant. Code of Alabama, 1940, Tit. 15, Sec. 211. This is allowed in Alabama only when there is some obligation or undertaking (bond) owed *to the court* for which the bail stands good for the defendant, and the only amount owed is due the bondsman for payment to the court on behalf of the defendant in settlement of his obligation. In the case at bar, there was a fine of $100.00 in lieu of a sixty day jail sentence; an appeal bond was taken out for the appellant by the Company; and the uncontroverted testimony of appellant is that the Company paid his fine and then attempted to collect the equivalent amount from him. This obviously was nothing more than an attempt to collect a civil demand, the amount of which was in controversy.

We have cautiously studied the evidence in this case and have sought to reconcile the evidence with the purpose and intent of the law of bail and nowhere do we find legal authority which condones the pursuits or conduct of the bail herein on this occasion.

As we endeavor to determine the degree, if any there be, of the crime here charged,

we observe the activities of the deceased and the armed posse of which he was a member. We find that in the grey of the morning, at about 5:00 A.M., they invaded the sanctity of the humble domicile where rested this appellant, who had committed no high crime, in an effort to collect a paltry $40.00 civil demand.

In Ison v. State, 252 Ala. 25, 39 So.2d 249, this court ruled:

"The law on this question is thus stated in Baugh v. State, 215 Ala. 619, 621, 112 So. 157, 159: 'A person attacked in his own dwelling, under conditions otherwise entitling him to strike in self-defense, is not required to retreat although his assailant also resides in the same dwelling.' And in the recent case of Bryant v. State, [252] Ala. [153], 39 So.2d 657, 658 * * * it was there noted: 'A proper statement of the pertinent doctrine is that a person is not obligated to retreat where, being without fault in bringing on the difficulty, he is assaulted while in his dwelling house, office, or place of business, or within the curtilage thereof, and it is immaterial whether the assailant is an intruder or another lawful occupant of the premises, but a defendant not so circumstanced is without the benefit of the doctrine.'"

See also Vinson v. State, 29 Ala.App. 234, 194 So. 705; Miller v. State, 31 Ala.App. 329, 16 So.2d 803.

The uncontroverted testimony of appellant regarding a conversation he had with Mr. Dean was as follows:

"Q. What was that $10 for?

"A. For bonding me out again. They bonded me out once. The first time when I got out of jail they bonded me and I paid it, the $10, and after they had my trial he come back and bonded me out again and I paid him $10 more.

"Q. Now, did you pay him anything else?

"A. I paid him about $80 afterwards.

"Q. What was that for?

"A. He told me when I come back the next week—he asked me before I left did I want to have to meet trial again or would I rather for him to pay the time off for me because I had 60 days, and I said, yes, sir, I would, and so when I went back the next week to make a payment *he said I paid your time with the City and he said you owe me $120* and I said, well, that's all right, and so I paid him $15 then. (Emphasis ours.)

"Q. How much did you pay him in all, do you know?

"A. One hundred dollars."

State's Exhibit No. 7, which consists of two data payment cards and two receipts of appellant, was identified by Mr. Dean. The following was set out as a part thereof:

"Owes Fine & Cost $117.00"
 60 days

This exhibit is dated October 15, 1963, and also shows the payments made to the Company by appellant on the above fine. The weight of this evidence tends to show that the fine was paid by the Company, which Company then attempted to collect the same from appellant. Dean denied this as being correct, however, the record reveals the general arrangement as follows in testimony between Dean and appellant's counsel:

"Q. Now, did you have any arrangement with respect to settlement of this case on appeal in the Circuit Court?

"A. I cannot say that I had an arrangement with Judge Loe. Perhaps one of my employees did. Generally, I can tell you that it is a hundred dollar fine and the Solicitor generally reduces a sixty day sentence to a hundred dollar fine, and they therefore deposit a hundred dollars and when we make our agreement with the Solicitor we generally have one hundred dollars.

"Q. Do you know whether there was such an agreement in this case or not?

"A. No, but I would still assume that there was one.

"Q. As a matter of fact, Sam was paying on the fine, was he not?

"A. That's right."

 From the foregoing, it may be assumed that there was no debt owed by appellant to the circuit court. The tendency of the evidence is to show that appellant owed, at the time of this attempted arrest, only the $40.00 remaining of that equivalent amount paid by the Company to the court for appellant's fine. Thus, the debt was to the Company, and not to the court. This being the case, the bail (or bondsmen) was unjustified in coming to appellant's house *at any time* with an arsenal to collect any debt of any kind. The law was promulgated in favor of bonding companies to aid them in execution of their business and to prevent them the risk of losing money if they felt that their client would not pay or would "jump bail", and to insure that they, as sureties, would not be held liable in his stead. The purpose of the law was not to aid in the collection of private debts of the bonding company, *no matter what the origin of the debt*. The Code cannot and must not be construed to license company officials to run around the countryside armed with lethal weapons, to-wit, shotguns and pistols, in an effort to collect their personal debts. The laws of this State will not permit the arrest of individuals for the simple reason that they happen to owe a debt. The proper procedure for enforcing collection of a debt is not by means of an armed posse descending upon the debtor at 5:00 A.M. in his own domicile.

If the premise that the Company was collecting a personal debt is correct, it was then manifestly trespassing on the premises of the appellant in the exercise of undue and improper force, and the certified copy of the bond which they allegedly had in their possession was a nullity as the court had been satisfied with payment of the fine and had no further interest in the case.

To allow individuals, not law enforcement officers, to "arrest" debtors while armed with shotguns and pistols could only lead to useless and unnecessary bloodshed.

Even if this were a legitimate and valid bond leading to a valid arrest in strict compliance with the Code, the very methods and means used by the Company must still be examined. This "pay or get shot" attitude has too long been allowed to flourish with bonding companies. The controls over the bail should henceforth be tightened to exclude the use of weapons when not justified, to provide for investigation into every instance where it is claimed that weapons are needed, and the mandatory accompaniment by a law enforcement officer on such occasions.

The proper means of bringing these circumstances before the court is by a motion for a new trial by appellant, which was adequately complied with in this case. Shirley v. Shirley, 261 Ala. 100, 73 So.2d 77. See also Code of Ala., 1940, Tit. 7, Sec. 276. In support of this contention it is stated in Cobb v. Malone & Collins, 92 Ala. 630, 9 So. 738:

"The power to set aside verdicts has been generally regarded in this country as inherent in courts organized upon the principles of common law, though in some states it is regulated by statute, enumerating the grounds upon which a motion for a new trial may be made. The power is essential to prevent irreparable injustice * * *. [It] should be exercised, only, when it affirmatively appears that the substantial ends of justice require the examination of the facts by another jury."

See also Bush v. Stanton, 273 Ala. 615, 143 So.2d 621; City of Tuscaloosa v. Townsend, 274 Ala. 268, 147 So.2d 824.

■ Where a verdict is palpably contrary to the evidence a motion for a new trial on that ground should be granted. Cable-Burton Piano Co. v. Thomas, 26 Ala. App. 26, 152 So. 466. See also Southern Ry Co. v. Dear, 26 Ala.App. 508, 162 So. 685; American Life Ins. Co. v. Anderson, 246 Ala. 588, 21 So.2d 791; Birmingham News Co. v. Lester, 222 Ala. 503, 133 So. 270; Carraway v. Graham, 218 Ala. 453, 118 So. 807.

■ It is true that the trial court has the inherent power to rule that a verdict is against the weight of the evidence presented and overturn the findings of the jury; but it should also be true that higher courts may do so when, in their opinion, the trial court has not exercised its prerogative. Therefore, a jury verdict may be overturned only where there is such a palpably wrong decision in view of the evidence that it would be an injustice to continue with the verdict and judgment of the trial court. Though the courts are loathe to overturn a jury verdict because of the proximity of the jury to the witnesses and their ability to best judge the case on its merits because of this position, when the verdict is against the weight of the evidence and is objected to after the judgment by the trial court by a motion for new trial listing this as a ground, then, in the interest of justice, the higher courts must take it upon themselves to correct these mistakes to preserve the ideals of justice which they are sworn to uphold.

■ In the case at bar, the testimony did not in our opinion show that the appellant was guilty of murder in the second degree.

We have conducted diligent and extensive research for the law applicable to this matter and this opinion contains the cases most pertinent to the issues here involved.

In this anxious hour, the crisis of the fate of human liberties, this verdict should not stand as the same is not a product consistent with or authorized by the evidence before us. The same must, therefore, be and is hereby

Reversed and remanded.

PRICE, P. J., concurs in judgment of Reversal and Remandment only.

CATES, Judge (dissenting).

I respectfully dissent from the judgment of reversal herein. Wheat v. State, 281 Ala. 287, 202 So.2d 73.

Shine was a party to a cunctative manoeuvre to hinder a municipal court sentence. This circumstance alone should keep us from designating his would-be captors as assailing trespassers to be shot down as though they were vicious burglars, or boarding pirates.

According to what light I can perceive through the heat of Judge Johnson's excoriation of the bail bondsmen, Shine had been convicted of an *ordinance violation.* In order to stall off going to city jail or paying a fine, he took an appeal.

Municipal law lets a defendant, within five days from conviction, post bond with sureties and go free to answer the same charge in the circuit court. Code 1940, T. 37, § 587, as amended.

The opportunity to use this device of an "appeal" so as to afford a defendant additional free time in order to "keep his feet on the ground" and perhaps raise money seems not to have been lost on both Shine and the instant bail bondsmen. I think that Shine ratted on his liberators.

Because Shine was to obey and endure a municipal court sentence, his bondsmen were under no duty to surrender him to the sheriff. Rather, the chief of police was the receiving officer. I see nothing that contradicts an intention on the part of Dean to take Shine to the chief. I think the deceased was acting under color of presumptive legal right to retake Shine.

Shine may have been, to borrow a cliche, thwarting a diabolical plot to kidnap him.

 

If so, he should have first adduced evidence to show it, and second he should have asked the trial judge for an instruction as to the inferences which the law would let the jury draw concerning the testimony.

In Thomas v. State, 255 Ala. 632, 53 So. 2d 340, the deceased was a foredawn-collecting money lender. Here Shine himself had brought about a contract of bail, an obligation which put a legal string on his own freedom.

For Shine to repudiate his bail bond with a pistol is but anarchic murder. The jury was charitable in only giving Shine fifteen years.