Second degree manslaughter; sentence: twelve months hard labor.
Appellant was convicted of second degree manslaughter under an indictment charging him with the first degree murder of his wife, Jeannene Mayhall Gantt. The indictment charged that her injury was caused by being struck by the fist or feet of the appellant, "or by means otherwise unknown to the grand jury."
On July 4, 1976, both the appellant and the deceased attended a party given by friends. During the course of the party, several persons noticed that the deceased was crying. She was apparently upset because a former girl friend of her husband was also at the party. Witness Patricia Ard testified that she was talking to the appellant during the party and told him that his wife was crying, to which he replied: "She had better damn not be." Other witnesses stated that the deceased came up to the appellant later and attempted to hug him or put her arm around him, but he pushed her arm away and told her to go home. She left the party about 8:30 P.M. in her mother's car. Appellant was seen walking toward his car at about the same time. He was not seen again at the party until about two hours later. Witnesses noticed that his car had been moved during that period of time and parked in a different place. By 11:30 P.M., the appellant had become highly intoxicated, and an acquaintance drove him home. There were no witnesses other than the appellant as to what happened between the time he arrived home and the time that he carried his wife to a local hospital the next morning. The State's evidence was entirely circumstantial.
The appellant testified that when he came home after the party, he did not have *Page 709 
his keys with him, but discovered that the front door to the house was unlocked. Upon entering, he found his wife lying naked on the floor of her dressing room and apparently asleep. He stated that he put her to bed and did not realize that anything was wrong with her until the next morning when he could not awaken her.
When he discovered that his wife was unconscious on the morning of July 5, the appellant carried her to the nearest hospital, and she was then transferred by ambulance to another hospital. She never regained consciousness and died a few days later as a result of subdural hematoma, a bleeding into the brain. Her mother testified that she was very hard to awaken when asleep. The injury to her head neither fractured the skull nor broke the skin of her scalp. Investigating officers found no blood stains or any evidence of a fight, a struggle, or a break-in when they searched the home on the morning of July 5.
The crux of the defense was that the deceased had accidentally fallen and hit her head or was injured by a third party unknown to the appellant, and that the appellant had no part in producing the injuries that caused her death. The State's expert medical witness, a pathologist's assistant, testified as to the cause of death from an autopsy he performed. He stated that the injury to the head was from a blunt object and could be consistent with an injury incurred by having been struck with a fist. He likewise admitted that the injury could be consistent with any number of other forces that would fall within a description of "blunt force trauma."
A defense expert witness, a pathologist, testified that the subdural hematoma suffered by the deceased was more consistent with an injury suffered by a fall than by the head being struck by an object. He stated that an object striking the head makes a different type wound than a wound incurred by the head striking a stationary object. The pathologist stated that the instant case was a classical example of an injury associated with a fall. However, on cross-examination, he admitted that such an injury could be consistent with someone's being struck with a fist or kicked with a foot.
Mrs. Melba Jean Mayhall, mother of the deceased, testified that the appellant called her on the morning of July 5 and stated that the deceased was in the hospital in intensive care. She stated that the appellant told her over the telephone that he had come home the night before and had found the deceased beaten up and had brought her to the hospital. The appellant again talked to Mrs. Mayhall after she had come to the hospital to see her daughter. She stated:
 "Well, he explained to me that he had come home and Jeanine was lying in the floor in the middle bedroom where she always dressed and that he thought she was lying in the front of the vent trying to get some cool air was what he thought; that he didn't know at the time that anything was wrong, and he picked her up and put her to bed.
* * * * * *
 "Well, he told me he should have, you know, he said, `I should have left the party and gone home with Jeanine. When I picked her up and put her in bed I was intoxicated and did not realize that anything was wrong.'"
Billie Brunner, a receptionist at the East End Hospital Emergency Room, testified that the appellant brought the deceased to the emergency room for treatment around 8:30 A.M. on July 5. She stated that the patient was not breathing, but did have a pulse at the time. Hospital personnel put the patient on a "breathing machine," and in a short time transferred her by ambulance to St. Vincent's Hospital for further treatment. Mrs. Brunner testified as to the account the appellant gave her of the injuries to his wife:
 "A. I asked him what happened. I said, `What happened to her?' And he said, `Well, she's been beaten up.' I said, `How do you know she's been beaten up?' And he said, `Well, I just took it for granted she was beaten up.'
* * * * * * *Page 710 
 "A. . . . He said, `Well, we both went to a party last night and when we come — we went together, but we come home at different times.' And he said, `When I got home I found her on the floor naked. Someone had broken into the house and beaten her up.' He said, `I thought she would be better by morning and she was not, so I decided I better bring her down here and get ya'll to see about her.
* * * * * *
 "A. He walked up to me and he said, `You don't have to call the police.'
"Q. What did you say at that time?
 "A. I don't know. I said, `We do have to call the police. We have to do that on all accidents and anything that happens like that.' And I might have told him that I did. But I know we do do that. He just made the statement to me, `You don't have to call the police.'"
William Dale Leatherwood, a Birmingham police officer, testified that he interviewed the appellant at the East End Hospital on the morning of July 5. He said the appellant told him that, upon arriving home around midnight the previous night, he found his wife lying nude on the living room floor, that he thought she had too much to drink at the party, and he put her to bed. Appellant told the officer that he was unable to awaken his wife the next morning, so he took her to the hospital. Appellant did not mention a beating, nor did he mention that his wife was lying in front of an air vent.
The defense filed a motion to exclude the State's evidence at the end of the State's case in chief, and also filed a motion for a new trial after judgment, both of which were overruled. In overruling the motion to exclude the State's evidence, the trial judge stated that in cases of a mysterious death, or where there were no witnesses to the death, then the appellant giving different accounts of what happened would be sufficient to present the case to the jury, citing Gardner v. State,40 Ala. App. 276, 111 So.2d 916 (1959). This court in Gardner
stated:
 "Every homicide is presumed unlawful unless expressly excused or justified by law. A homicide being shown, it is incumbent upon the defendant to show the circumstances in mitigation, excuse, or justification, unless shown by the evidence produced against him. The degree of mitigation, the validity of the excuse, or justification, are for the jury. Champion v. State, 35 Ala. App. 7, 44 So.2d 616. "If for no other reason, the appellant's varied, and varying accounts of the shooting would make this a question for the jury."
The instant case differs from Gardner. Here, the victim was found unconscious, and the injury could have been caused by an accidental fall on her part, or by being hit or kicked by her husband, or by any number of other means. In Gardner, supra, the deceased was shot with a gun. The appellant there told police that, while he and deceased were standing on a street, a car drove by and someone shot the deceased from the car. The next day he told police that he had heard noises in the back of a store and had fired through a rear door and had hit the deceased. Still later he gave an account of the shooting as happening during a scuffle between him and the deceased, in which his gun had accidentally discharged.
In the instant case, there is no great discrepancy between the account given by the appellant to either his mother-in-law, to the hospital receptionist, or to Officer Leatherwood. In setting out the facts above, we have written them in the strongest light favorable to the State, and yet the discrepancies in the appellant's account of what transpired fall way short of the discrepancies in the stories given by the defendant in Gardner, supra. Appellant's assumption that his wife had been beaten was not unreasonable as she had the appearance of having what is commonly referred to as two "black eyes." That condition, according to medical testimony, results from blood accumulating in the soft tissue under the eyes which is common in similar concussion type injuries to the head. Likewise, appellant *Page 711 
never admitted that he in any way hit or beat his wife, whereas in Gardner, the defendant in two of his three accounts admitted firing the fatal shot, but sought to excuse his actions.
It is true that every killing, or homicide, is presumed unlawful unless expressly excused or justified by law. However, every death is not presumed unlawful. There is a great difference between a death which is apparently the result of foul play, or the use of a deadly weapon, and one which could have been caused by a pure accident, the means of which are unknown.
The only case of any significant similarity to the instant fact situation which we have found is McMurtrey v. State,39 Ala. App. 319, 101 So.2d 88 (1957), cert. denied 267 Ala. 259,101 So.2d 93. In McMurtrey, this court stated:
 "The evidence of State's witness Sowell tended to show that the deceased came to his death as a result of blows inflicted by a blunt instrument, or a fist. Further evidence by the State tends to show that this appellant was the only person with deceased during the time said blows could have been inflicted. A homicide being shown, it was incumbent upon the appellant to prove circumstances in mitigation, excuse, or justification, unless shown by the evidence produced against him. The degree of mitigation, the validity of the excuse or justification are questions for the jury. Champion v. State, 35 Ala. App. 7, 44 So. 616." (Emphasis supplied.)
McMurtrey also differs from the instant fact situation in that the instant appellant was not the only person who could have inflicted the blow. From the evidence given by both medical experts presented by the State and the defense, the means of the appellant's injury were just as likely to have been from an accidental fall as from being hit by a fist or other blunt object. While there was no evidence of a struggle or a break-in at the residence, there was evidence that the deceased was alone for a long period of time until discovered unconscious by her husband. The appellant's testimony as to these events cannot be disregarded simply because he was the defendant in the case.
We do not read McMurtrey or Gardner, supra, to mean that any person finding a fatally injured person or a dead body is presumed to have caused the resulting homicide, thereby shifting the burden to that person to prove their innocence, or at least "circumstances in mitigation, excuse, or justification."
The only hint of foul play in the instant case comes from speculative answers given by the two medical experts, to hypothetical questions propounded to them, to the effect that the injuries could be consistent with being hit by a fist. The direct medical testimony was much more persuasive that the injury most likely resulted from a fall. Although this issue would normally be decided by a jury, the State must show some connection between the appellant and the injury before a jury may find him guilty of homicide in any degree. The mere fact that the appellant was rude to his wife earlier in the evening at the party certainly does not connect him with the injuries she sustained. The only evidence as to the condition of the deceased when her injury was first discovered comes from the appellant. In no account given by him to any witness does he admit that he harmed his wife in any way. It is only by speculation that a jury could connect the appellant with the injuries to his wife.
As a general proposition, circumstantial evidence is given the same weight as direct evidence, so long as it points to the accused as the guilty party. Locke v. State, Ala.Cr.App.,338 So.2d 488 (1976); Lark v. State, Ala.Cr.App., 348 So.2d 539
(1977). A conviction may be had on circumstantial evidence so long as that evidence is so strong and cogent as to show the defendant's guilt to a moral certainty. Tanner v. State,291 Ala. 70, 277 So.2d 885 (1973); Hollenquest v. State, 290 Ala. 146, 274 So.2d 613 (1973). Furthermore, if circumstantial evidence fairly permits an inference consistent with innocence, it will not support a conviction. Cooper v. State, 235 Ala. 523, *Page 712 
180 So. 102 (1938); Carr v. State, 28 Ala. App. 466, 187 So. 252
(1939). There must be substantial evidence to prove all elements of the charge against a defendant, Ex parte Grimmett,228 Ala. 1, 152 So. 263 (1933), and it is a violation of due process to convict and punish a person without any evidence at all of his guilt, Clemons v. City of Birmingham, 277 Ala. 447,171 So.2d 456 (1965).
While appellate courts do not normally weigh or evaluate evidence presented to a jury, such a task becomes necessary when the weight and sufficiency of the evidence is properly challenged in the trial court below. Here, by motion to exclude the State's evidence, by request for the affirmative charge, and by motion for a new trial, the appellant properly presented that issue to the trial court. By reviewing the trial court's ruling thereon, we necessarily evaluate the weight and sufficiency of the evidence. After careful review, we conclude that the evidence presented by the State was insufficient to support the verdict.
We think the case can be summed up by quoting from our Supreme Court on the proposition of circumstantial evidence inEx parte Acree, 63 Ala. 234 (1879):
 ". . . Such proof is always insufficient, unless it excludes, to a moral certainty, every other reasonable hypothesis, but that of the guilt of the accused. No matter how strong the circumstances, if they can be reconciled with the theory that some other person may have done the act, then the defendant is not shown to be guilty, by that full measure of proof which the law requires. . . ."
Reversed and Remanded.
All the Judges concur.