435 So.2d 772 (1983)
Gary Lindsey BELL
v.
STATE.
1 Div. 453.
Court of Criminal Appeals of Alabama.
July 5, 1983.
*773 E.E. Ball and David A. Simon of Owen & Ball, Bay Minette, for appellant.
Charles A. Graddick, Atty. Gen., and Jane LeCroy Brannan, Asst. Atty. Gen., for appellee.
BOWEN, Presiding Judge.
The defendant was indicted for the murder of his six-week-old son. A jury found him guilty of manslaughter. Sentence was ten years' imprisonment.
The only issue on appeal concerns the testimony of the State's forensic pathologist that the injuries to the infant were inflicted as a result of "a homicidal murder."
In his confession and in his testimony at trial, the defendant maintained that his son was injured when he fell off a kitchen counter. An autopsy revealed that the infant sustained extensive injuries including multiple fractures of several ribs, and a fracture of the spine.
Pediatrician Charles B. Hunter examined the infant in the emergency room on the evening of August 15, 1981. Although he testified that he did not have an opinion as to the manner in which the injuries were inflicted or caused, he stated that it was "not probable" and would have been "very unlikely and unusual to have this much injury falling off a kitchen counter." He stated that he would be "suspicious" as to how the injury was obtained: "Because of the age of the child it would be extremely unusual to, for the child to simply roll off a counter and hit his head. When I would be presented with a total situation like this, I would be suspicious that there was child abuse." There was no objection or motion to exclude this answer. On cross examination, Dr. Hunter did state that "it's possible" that the infant received the injuries in the manner in which the defendant stated.
Neurosurgeon Dr. Henry Mostellar, Jr., testified that, although anything was possible, the injuries were more consistent with "severe trauma from automobile accidents, fall of, out of a second floor window, something of this sort." In his opinion, the fall off the counter "would be less probable as the cause of these injuries."
State forensic pathologist Dr. LeRoy Riddick examined the infant's body on September 24, 1981, after exhumation. He gave detailed and specific testimony as to the extent and nature of the infant's injuries. *774 Then, on direct examination, the record reveals the basis for the defendant's argument on appeal. We set forth the following portion of the record to place the remark within its proper context:
"Q. Doctor, based on the injuries you have described, a broken spine, broken ribs, hemorrhage, skull fractures, do you have an opinion as to the cause of death of Blakely Todd Bell?
"A. I have, sir.
"Q. What is that opinion?
"A. He died from multiple injuries which he received to his head and to his chest, and the fractures of the skull and injuries to the brain, the fractures to his spine and the fractures to his ribs.
"Q. Given the totality of the circumstances to include the nature of the injuries, the extent of the injuries, the pattern of the injuries, do you have an opinion as to the manner in which these injuries were inflicted?
"A. It was a homicidal murder.
"Q. And what was that
"MR. BALL (Defense Counsel): If you please, Judge, he answered before I could object. We object and move to exclude that.
"THE COURT: All right, Doctor
"MR. BALL: There's no predicate for that, laid for that answer whatsoever.
"THE COURT: All right, read back the question, Mrs. Bell.
(Requested question read).
"THE COURT: You can answer that, Doctor, yes or no, whether or not you have an opinion.
"A. Yes sir.
"Q. And what is that opinion?
"MR. BALL: Now, then, Judge, we object to that on the grounds that no proper predicate has been laid.
"THE COURT: Overruled.
"A. It's a homicide.
"Q. With reference to Blakely Todd Bell, what do you mean when you say, quote, it's a homicide?
"A. I mean that the injuries were inflicted by another individual upon Blakely Todd Bell.
"Q. And how do you arrive at this opinion that the injuries to Blakely Todd Bell were inflicted by another person?
"MR. BALL: Now, we object to that, Your Honor. He is not entitled to ask the doctor how he arrived at it. He is entitled to solicit his opinion, or whether or not he has an opinion, and what that opinion is. How he arrived at it is a matter of cross examination.
"THE COURT: I will allow him to so state for record.
"MR. BALL: Then we except, Your Honor.
"THE COURT: Overruled. You may state the basis of your opinion.
"A. First of all, it's my experience as a father. Second of all, my experience as a forensic pathologist who has had occasion to examine deaths of, unfortunately, multiple infants, and that the third is the basis of the past medical history and the pattern of injury and the overwhelming extent of these injuries in a six week old infant. By the pattern of the injuries, both to the head and to the chest, they are in my opinion beyond any reasonable medical doubt that the child could have sustained these in any accidental way. Certainly not from a simple fall, because there are injuries to the front, side, both sides and the back of the skull and there are injuries to both the front and back of the chest and severe fracture to the spine, and there's just no way that a child with a simple fall could sustain these overwhelming injuries. People in my profession have made studies of this
"MR. BALL: Your Honor, excuse me. I don't mean to cut the doctor short, but I think he has answered the question.
"THE COURT: Your next question, please, Mr. Galanos.
"Q. Doctor, you just made reference to people in your profession making studies. Again, pursuant to your professional duties as a forensic pathologist, do you *775 maintain a file on battered and/or abused children?
"MR. BALL: Judge, we object to that and ask the Court again to ask Mr. Galanos tothere's no basis whatsoever that there was a battered or abused child. That's the ultimate fact for the Jury to determine, and to couch his question in those terms is highly prejudicial, and we object to it, plus statistical data gathered by Dr. Riddick or his office is not pertinent here as pertains to this particular case."
After some additional argument and questioning, the trial judge sustained defense counsel's objection to this last line of questioning.
On appeal, the defendant contends that the witness's answer that the infant's injuries were the result of "homicidal murder" was patently and plainly error because it constituted an opinion upon an ultimate issue in a case and amounted to an opinion on a question of law. This objection was not raised in the trial court to this answer.
It is a general principle of evidence that a witness may not testify to the ultimate issue in the case. Pointer v. State, 283 Ala. 320, 216 So.2d 713 (1968) (fire of incendiary origin was set); Colvin v. State, 247 Ala. 55, 22 So.2d 548 (1945) (fire of incendiary origin); Spooney v. State, 217 Ala. 219, 224, 115 So. 308 (1928) (defendant was still driving recklessly); Wyatt v. State, 405 So.2d 154, 157 (Ala.Cr.App.1981) (patient was a victim of child abuse); Lee v. State, 42 Ala.App. 101, 102, 154 So.2d 45, cert. denied, 275 Ala. 695, 154 So.2d 46 (1963) (defendant killed son); Vinson v. State, 29 Ala.App. 234, 236, 194 So. 705 (1940) (defendant murdered victim); Stewart v. State, 27 Ala.App. 315, 317, 172 So. 675 (1937) (defendant raped victim); Taylor v. State, 20 Ala.App. 161, 163, 101 So. 160 (1924) (defendant assaulted victim).
However, a properly qualified expert may state his opinion as to the nature, cause, and effect of a wound or injury, Thomas v. State, 249 Ala. 358, 360, 31 So.2d 71 (1947), and the "manner or means by which the injury could have been inflicted." Tuck v. State, 384 So.2d 1240, 1242 (Ala.Cr.App. 1980). He may state what kind of weapon or instrument could have caused a particular wound, but not whether that weapon actually did. White v. State, 294 Ala. 265, 271, 314 So.2d 857 (1975). See Aaron v. State, 271 Ala. 70, 83, 122 So.2d 360 (1960) (cuts consistent with fingernail scratches); Robinson v. State, 243 Ala. 684, 690, 11 So.2d 732 (1943) (injuries could have been caused by having been struck with a hand or fist and by having been choked); Wilson v. State, 195 Ala. 675, 71 So. 115 (1916) (death could have been caused by falling on a railroad rail); Simon v. State, 108 Ala. 27, 18 So. 731 (1895) (death was the effect of a blow); Mitchell v. State, 18 Ala.App. 471, 473, 93 So. 46, cert. denied, Ex parte Mitchell, 208 Ala. 699, 93 So. 923 (1922) (wound was made with a blunt instrument).
A careful reading of the record shows that the trial judge never ruled on defense counsel's objection to the pathologist's answer of "homicidal murder". Without an adverse ruling the issue of the objection is not properly before this Court. Showers v. State, 407 So.2d 169, 171 (Ala.1981); Morris v. State, 268 Ala. 60, 66, 104 So.2d 810 (1958). Also, we find no objection to the pathologist's answer that it was a "homicide". Although defense counsel did object to the question asking the witness to state his opinion, an expert may give his opinion of the cause of the injury as discussed in this opinion.
Additionally, there was no proper objection and the ground of objection presented at trial is different from that raised on appeal. The pathologist's response that the injuries were caused by "homicidal murder" does not constitute plain error. Even a witness's statement that her husband was "murdered" by the accused requires objection before this Court can place the trial court in error. Vinson, 29 Ala.App. at 236, 194 So. 705.
The particular objection to this response advanced on appeal (that an expert cannot give his opinion upon an ultimate issue) was not raised at trial. The objection at trial (that of no proper predicate) does not reach *776 the proper objection that the testimony involved a field (intent) inappropriate for expert or opinion testimony. Colvin, 247 Ala. at 56, 22 So.2d 548. We note that defense counsel had previously stipulated that the pathologist was "eminently qualified".
The defendant is bound by the ground of objection stated at trial. Gamble v. State, 19 Ala.App. 590, 99 So. 662 (1924). Specific grounds for an objection waive all grounds not specified and the trial court will not be put in error on grounds not assigned at trial. Watkins v. State, 219 Ala. 254, 255, 122 So. 610 (1929). Grounds of objection to questions calling for particular evidence which are at variance with objections made at trial are not available on appeal. Wade v. State, 349 So.2d 141 (Ala. Cr.App.1977); Hargrove v. State, 344 So.2d 823 (Ala.Cr.App.), cert. denied, Ex parte Hargrove, 344 So.2d 826 (Ala.1977).
The significance of asserting the proper objection is found in the recognition that the fact that an expert's testimony is a "practical affirmation of a material issue in the case" does not render that opinion necessarily inadmissible. Colvin, 247 Ala. at 56, 22 So.2d 548; Clark v. State, 36 Ala. App. 159, 167-68, 57 So.2d 375, reversed on other grounds, 257 Ala. 95, 57 So.2d 384 (1951). It is generally recognized that "(e)ven though the opinion is addressed to an ultimate fact in issue, it does not constitute an improper invasion of the province of the jury." C. Torcia, 3 Wharton's Criminal Evidence, Section 617, n. 85 (13th ed. 1973).
Although the practice of asking an expert to give his opinion as to the entire case is frowned upon, "admissibility of an expert's conclusion depends on the nature of the issues and the circumstances of the case, and involves a large element of judicial discretion." United States v. McCoy, 539 F.2d 1050, 1063 (5th Cir.), cert. denied, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1976).
"A question seeking an opinion ought to be framed so as to avoid if possible the use of the very terms which the judge must use in his charge in taking the opinion of the jury. Some have thought an opinion on the ultimate issue to be wholly inadmissible.... Others have denied that that ought to have any effect on the question of admitting the opinion.... We think the true rule is that admissibility depends on the nature of the issue and the circumstances of the case, there being a large element of judicial discretion involved." Hamilton v. United States, 73 F.2d 357, 358 (5th Cir.1934).
"It is certainly contrary to the unmistakable trend of authority to exclude expert testimony solely because it amounts to an opinion upon ultimate facts." 31 Am.Jur.2d Expert And Opinion Evidence, Section 22 (1967).
There is a significant line of authority for the admissibility of a doctor's opinion that a child suffered from battered child syndromethat is, that the child received injuries which were inflicted by another person by other than accidental means. Annot. 98 A.L.R.3d 306 (1980). See State v. Wilkerson, 295 N.C. 559, 247 S.E.2d 905, 98 A.L. R.3d 285, 294 (N.C.1978) ("As far as our research reveals, all courts which have considered the question, ... have concluded that such expert medical testimony concerning the battered child syndrome as was offered in this case is properly admitted into evidence"). See also the annotation at 18 A.L.R.4th 1153 (1982) involving the admissibility of expert or opinion testimony on the battered wife or battered woman syndrome and the annotation at 16 A.L. R.4th 666 (1982) involving the admissibility of expert testimony as to whether the accused had the specific intent necessary for conviction.
In a homicide prosecution, the testimony of a forensic pathologist that the manner of the victim's death was, in his opinion, "homicide" is not reversible error on the theory that the testimony usurped the function of the jury by expressing an opinion on an ultimate issue. Commonwealth v. Daniels, 480 Pa. 340, 390 A.2d 172 (Pa.1978).
"Appellant next contends that when Dr. Fillinger testified that, in his opinion, the manner of Smith's death was `homicide', *777 he usurped the function of the jury by expressing an opinion on an ultimate issue, and that this constituted reversible error. This argument is devoid of merit. As applied to the expression of an expert's opinion, the phrase `usurping the function of the jury' is, as Dean Wigmore has well said, normally `a mere bit of empty rhetoric.' VII Wigmore, Evidence, Section 1920, at 17 (3d ed. 1940). `... (T)he witness, in expressing his opinion, is not attempting to usurp the jury's function; nor could he if he desired.... He could not usurp it if he would, because the jury may still reject his opinion and accept some other view ...' Id. at 21. The contention that an expert should never be permitted to express an opinion on an `ultimate issue' is similarly misconceived. `(E)ven when the very point in issue is to be spoken to, the jury should have help if it is needed.' Id. Section 1921, at 18. Pennsylvania cases, which recognize that the central inquiry is whether the proffered opinion will be helpful to the trier of fact in reaching a decision, are in accord. Reardon v. Meehan, supra, 424 Pa. [460] at 464-66, 227 A.2d [667] at 670-71 [(1967)]; Auerbach v. Philadelphia Transportation Co., 421 Pa. 594, 604-05 221 A.2d 163, 170-71 (1966); Commonwealth v. Nasuti, supra, 385 Pa. [436] at 443, 123 A.2d [435] at 438 [(1956)]; Cooper v. Metropolitan Life Ins. Co., 323 Pa. 295, 186 A. 125 (1936). Compare Taylor v. Fardink, 231 Pa.Super. 259, 331 A.2d 797 (1974). See also Fed.R. Evid. 704, and Advisory Committee's Note thereto; Model Code of Evidence, Section 904.
"`Undoubtedly there is a kind of statement by the witness which amounts to no more than an expression of his general belief as to how the case should be decided.... There is no necessity for this kind of evidence; ... it is wholly without value to the trier of fact in reaching a decision.' McCormick, supra, Section 12, at 26-27. Such a situation does not exist in this case. The question of the cause of Jonathan Smith's death, involving as it did `explanations and inferences not within the range of ordinary training, knowledge, intelligence and experience', Commonwealth v. Nasuti, supra, was clearly a proper subject for expert testimony. The word `homicide', as the trial judge pointed out to the jury at the conclusion of the doctor's testimony, is a neutral term. The ultimate issue in this casewhether Daniels was legally responsible for Smith's death was in no way decided for the jury (as indeed it could not be) by the doctor's use of a shorthand term that was fully elucidated both by his testimony and by the trial judge's instructions." Daniels, 390 A.2d at 178-79.
Dr. Riddick's testimony of "homicidal murder" was in addition to the testimony of another expert that the infant's injuries could have resulted from child abuse. The defendant maintained in his confession, the voluntariness and admissibility of which were stipulated to by defense counsel, that his son fell off a kitchen counter where he had placed him and "forgotten" him. In that confession, the defendant answered the following question:
"Q. Gary, scientifically, it's going to look like it's impossible to get these kind of wounds from what you're saying happened to the boy.
"A. Yes sir.
"Q. So you're in a very serious position in the death of that child.
"A. Yes sir. I understand. It don't look right to me, you know, also cause it seems like a fall that far wouldn't have ."
By far the most damaging testimony elicited from Dr. Riddick concerned his opinion of the manner in which the child's injuries could have been inflicted.
"The injuries are most consistent with the ribs being fractured in front and back, with somebody holding the child, squeezing the chest and hitting the child's head against a blunt force, such as a top of a counter or something."
*778 There was no objection to this answer. The trial judge instructed the jury on the weight and effect of expert testimony and charged that they were "not required to accept the conclusions or expressed opinions of expert witnesses." That the jury found the defendant guilty of manslaughter and not murder evidences the fact that they determined for themselves the weight to be given such testimony.
We have read the entire record in this case. While we do not condone the pathologist's characterization of the cause of the injuries as "homicidal murder", the remark does not warrant the severe condemnation of a reversal of the defendant's conviction. The evidence was overwhelmingly against the defendant. That he was only convicted of manslaughter and not murder must be attributed to the skill and effectiveness of defense counsel as well as the mercy of the jury and not in any sense to the merits of his case.
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.