Binta Maryam BARAKA, Appellant

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2004–SC–0256–DG.

Supreme Court of Kentucky.

June 15, 2006.

V. Gene Lewter, Lexington, KY, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Gregory C. Fuchs, Assistant Attorney General, Office of Criminal Appeals, Office of the Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice GRAVES.

Appellant, Binta Maryam Baraka, entered conditional guilty pleas to second-degree manslaughter and being a persistent felony offender in the second degree. For these crimes, Appellant was sentenced to ten years imprisonment. The Court of Appeals affirmed the judgment and we granted discretionary review. The sole issue presented before us is whether the trial court erred when making a pre-trial *Daubert* ruling regarding the medical examiner's theory of "homicide by heart attack." For the reasons set forth herein, we affirm.

Appellant was indicted in Fayette Circuit Court for the murder of Brutus Price. The Commonwealth alleged that stress related to a physical altercation between the victim and Appellant caused the victim to suffer a fatal heart attack. Appellant requested a *Daubert* hearing concerning the testimony of Dr. Cristin Rolf[1], M.D., a state medical examiner called by the Commonwealth. At the hearing, Dr. Rolf testified regarding her physical findings and her understanding of the circumstances surrounding the victim's death. She ultimately concluded that the cause of death was heart attack and the manner of death was homicide.

■ Appellant contends that Dr. Rolf's opinion regarding the manner of death in this case was unreliable and does not assist the trier of fact. After reviewing the whole of Dr. Rolf's testimony, the trial court ultimately determined that Dr. Rolf's opinion was admissible pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Miller v. Eldridge*, 146 S.W.3d 909 (Ky.2004), this Court unanimously stated:

> [W]hen an appellate court subsequently reviews the trial court's *Daubert* ruling, it must apply the abuse of discretion standard. And as we have noted in the past, the test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.

*Id.* at 914 (internal citations and quotations omitted). Reliability is reviewed for clear error while the determination as to whether certain testimony assists the trier of fact is reviewed for abuse of discretion. *Miller, supra*, at 917–19.

■ Here, the trial court based its reliability determination on the following evidence: (1) Dr. Rolf testified that "homicide by heart attack" was not a new, novel, or unique theory, but was widely accepted in the scientific community and among Dr. Rolf's colleagues; (2) Dr. Rolf was unaware of any colleagues who did not accept the theory; (3) Dr. Rolf introduced an article which indicated that the theory had been in practice and utilized for over 100 years; (4) Dr. Rolf knew of several other articles regarding the theory and had attended a lecture regarding the theory just a week prior; (5) Dr. Rolf had the education and professional experience to know of general theories regarding death and to make medical opinions based thereon; and (6) Dr. Rolf had performed autopsies on more than 500 heart attack victims. In the face of such uncontradicted testimony, we can find no clear error in the trial court's reliability determination.

■ Appellant nonetheless takes issue with the fact that Dr. Rolf's opinion was based, in part, on disputed information regarding the circumstances of the victim's death that was provided to her by police. Yet, as explained by the Court of Appeals, there is absolutely nothing improper about

---

1. Dr. Rolf's name is misspelled in both the briefs and in the Court of Appeals' opinion.

basing an expert opinion on "facts and data ... made known to the expert at or before the hearing." KRE 703(a). Indeed, the facts and data in this case, information regarding the circumstances of the victim's death provided by investigating officers, is exactly the kind of information customarily relied upon in the day-to-day decisions attendant to a medical examiner's profession. *See Buckler v. Commonwealth,* 541 S.W.2d 935, 940 (Ky.1976). It has been long held that such underlying factual assumptions are properly left for scrutiny during cross-examination. *See Brown v. Commonwealth,* 934 S.W.2d 242, 247 (Ky.1996) ("the credibility of every witness presented to testify in a legal proceeding, including expert witnesses, is subject to attack and cross-examination, this being the primary means by which trial counsel can attempt to persuade jurors of the weight or significance to be attached to the testimony of the witnesses") (quotation and citation omitted).

 Moreover, it is axiomatic that a determination of the cause and manner which led to a person's death is generally scientific in origin and outside the common knowledge of layperson jurors. *See, e.g., Stringer v. Commonwealth,* 956 S.W.2d 883, 889–90 (Ky.1997) ("[Jurors] usually do need the assistance of a medical expert in determining the cause of a physical condition in order to understand the evidence and determine the ultimate fact in issue."). Such medical testimony is even more critical in a case such as this where the manner of death is not necessarily clear from the mere physical evidence (as compared to a case where the person was shot or stabbed). We thus find it implicitly reasonable for the trial court to determine that a medical professional's opinion is helpful when determining whether stress from a physical altercation caused the victim to have a heart attack. *See Terry v.*

*Associated Stone Co.,* 334 S.W.2d 926, 928 (Ky.1960) (where medical doctor testified that a worker's heart attack was in part caused by physical exertion immediately prior to the attack, the Court stated "The question being of a medical nature entirely, determined on the basis of qualified expert testimony, it would be absurd for a court of lawyers to reject that conclusion as unsupported by probative evidence."); *see also, State v. Shaw,* 260 Kan. 396, 921 P.2d 779, 782–83 (1996); *State v. Washington,* 581 A.2d 1031 (R.I.1990); *Schlossman v. State,* 105 Md.App. 277, 659 A.2d 371, 380 (1995), *overruled on other grounds* by *Bailey v. State,* 355 Md. 287, 734 A.2d 684 (1999); *People v. Siwik,* 2004 WL 32733 (Mich.App.2004) (unpublished).

The trial court's determination is no less reasonable in spite of the fact that Dr. Rolf's determination necessarily included an opinion that a criminal act was likely committed in this case. The term, homicide, of course, does not presuppose the occurrence of a criminal act, but simply refers to when a person causes the death of another human being. *See Black's Law Dictionary* 739 (Seventh ed. 1999)("The legal term for killing a man, whether lawfully or unlawfully is 'homicide.' There is no crime of 'homicide.'"); *see also,* KRS 507.010. Medical examiners must make such determinations every time they indicate on a death certificate whether a death was natural, accidental, suicidal, homicidal, or undetermined. Such conclusions are an inherent part of the medical examiner's duties and have never been thought to invade the province of the jury. Indeed, the Court of Appeals cited as such in its opinion:

It is settled law that expert medical testimony expressing an opinion as to the cause of death, based on a hypothetical question embracing the material facts supported by the evidence, does not invade the province of the jury, is

admissible in evidence on the issue of cause of death, and although not conclusive on said issue, and even though it does not disprove every other possible cause of death, is sufficient to take such issue to the jury and to uphold a verdict in accordance therewith.

*Nordmeyer v. Sanzone,* 314 F.2d 202, 204 (6th Cir.1963) (citations omitted).

When the trial court's ruling is viewed in light of these prevailing facts and law, there are simply insufficient grounds on which to base a finding of clear error or abuse of discretion by the trial court.

The opinion of the Court of Appeals is affirmed.

COOPER, GRAVES, ROACH, SCOTT, and WINTERSHEIMER, J.J., concur.

COOPER, J., concurs in a separate opinion in which GRAVES and ROACH, J.J., join.

JOHNSTONE, J., dissents in a separate opinion in which LAMBERT, C.J., joins.

Concurring opinion by Justice COOPER.

The only issue reserved for appeal by Appellant's conditional plea of guilty, RCr 8.09, was the trial court's denial of Appellant's motion to suppress the opinion of the Commonwealth's expert medical witness, Dr. Cristin Rolf, that the manner of the decedent's death was "homicide by heart attack." I concur in the majority opinion as far as it goes, but write separately to further explain my view as to why the proposed testimony of Dr. Cristin Rolf would not have invaded the province of the jury.

Appellant allegedly engaged in a vocal and physical altercation with her father, following which her father died. Dr. Rolf was the medical examiner who performed the postmortem examination of the decedent's body and was the only witness to testify at the suppression hearing. She had reviewed police reports describing the altercation. That evidence presumably would have been admissible at trial.[1] Dr. Rolf testified that her postmortem examination revealed that the decedent was thin and frail and had suffered from coronary artery disease and pulmonary emphysema. She also found abrasions and contusions on his body which were not in themselves life-threatening. She concluded that the cause of the decedent's death was a heart attack. No one challenges Dr. Rolf's qualifications as an expert forensic pathologist or the admissibility of her opinion as to the cause of death. Appellant's only claim is that it was error to permit Dr. Rolf to express an opinion as to the manner of death.

Virtually every jurisdiction that has considered the issue has held that a homicide conviction can be predicated upon death by heart attack caused by stress resulting from actions of the defendant provided the prosecution proves both cause and effect. *E.g., People v. Stamp,* 2 Cal.App.3d 203, 82 Cal.Rptr. 598, 602–03 (1969) (conviction of felony murder affirmed where pathologist testified that severe stress experienced during robbery by defendant caused victim's fatal heart attack); *State v. Spates,* 176 Conn. 227, 405 A.2d 656, 658–60 (1978) (conviction of manslaughter affirmed where medical testimony established that cause of death was heart attack brought on by emotional stress occurring during robbery); *Maynard v. State,* 660 So.2d 293,

1. Appellant's conditional guilty plea did not reserve any objection to the admissibility of that evidence at trial, thus any objection was waived. *Cf. Gabbard v. Commonwealth,* 887

S.W.2d 547, 549–50 (Ky.1994) (defendant adequately preserved for appeal issue of whether he was competent to stand trial).

296 (Fla.Dist.Ct.App.1995) (conviction of manslaughter upheld where defendant's physical assault of victim produced no discernible physical injuries but victim died of heart attack, and medical examiner testified that the altercation caused the fatal heart attack); *Cromartie v. State*, 275 Ga. App. 209, 620 S.E.2d 413, 416 (2005) (conviction of vehicular homicide affirmed where intoxicated driver struck pedestrian who died of heart attack, and medical examiner testified that collision "directly and materially contributed" to pedestrian's death); *Thomas v. State*, 436 N.E.2d 1109, 1112 (Ind.1982) (conviction of murder affirmed where pathologist testified hypothetically that stress resulting from being robbed by the defendant would have been the primary cause of death); *State v. Vaughn*, 707 S.W.2d 422, 426 (Mo.Ct.App. 1986) (conviction of second-degree murder upheld where medical examiner testified that victim's cardiac arrest resulted from stress induced by defendant's assault); *State v. Dixon*, 222 Neb. 787, 387 N.W.2d 682, 689 (1986) (conviction of felony murder upheld where pathologist testified that cause of cardiac arrhythmia was shock experienced during burglary of victim's home by defendant); *In re Anthony M.*, 63 N.Y.2d 270, 481 N.Y.S.2d 675, 471 N.E.2d 447, 450, 452 (1984) (two cases) (juvenile adjudication of manslaughter in the second degree upheld where defendant snatched purse of elderly woman who fell and broke her hip and subsequently died of heart attack, where doctor testified that "the stress precipitated the myocardial infarction with subsequent cardiac arrest and ultimate death"); *id.* at 451–52 (felony murder conviction upheld where victim of burglary and robbery died next day of myocardial infarction and forensic pathologist testified it was reasonably certain "that the emotional and physical trauma of the burglary caused [the victim's] heart attack"); *State v. Atkinson*, 298 N.C. 673, 259 S.E.2d 858, 864 (1979) (conviction of felony murder upheld where medical examiner testified that victim died of heart attack and that injuries and stress caused by defendant's assault of victim contributed to and accelerated victim's death), *overruled on other grounds by State v. Jackson*, 302 N.C. 101, 273 S.E.2d 666 (1981); *cf. Commonwealth v. Evans*, 343 Pa.Super. 118, 494 A.2d 383, 389–90 (1985) (counsel was not ineffective in failing to assert insufficiency of evidence to sustain conviction of felony murder where forensic pathologist had testified that stress caused by defendant's robbery and kidnapping of victim aggravated victim's arteriosclerotic heart disease, resulting in his death).

We upheld a murder conviction in *Adcock v. Commonwealth*, 702 S.W.2d 440 (Ky.1986), based on evidence that the defendant raped and severely beat an eighty-year-old woman who died from a heart attack twenty-nine days later.

> There was medical testimony from which a jury was entitled to believe that the beating caused the death of Mrs. Relkin. Although she was old, had suffered a previous heart attack and had serious coronary artery disease, *the evidence would amply support* a finding that the beating hastened her death in that she would not have died when she did except for the precipitating factor of the beating.

*Id.* at 444 (emphasis added). Although the opinion does not recite the nature of the evidence that amply supported the verdict, it presumably included an expert opinion as to causation. *Sommers v. Commonwealth*, 843 S.W.2d 879, 884 (Ky.1992) ("In the present case, ... both the cause of death and the genesis of the fire were matters of crucial dispute, resolvable only through circumstantial evidence and expert opinion.").

Though we have no cases specifically addressing whether a medical examiner who is a forensic pathologist may express an opinion as to the "manner of death," it is not a question of first impression. A qualified expert may express an opinion about a matter requiring scientific, technical, or specialized knowledge if that opinion "will assist the trier of fact to understand the evidence or to determine a fact in issue." KRE 702. Accordingly, most jurisdictions that have addressed the issue hold that a qualified expert can express an opinion that the manner of a disputed death was homicide, *i.e.*, that the death of one person was due to an act or omission of another, as opposed to natural causes or suicide, though not that the homicide was intentional, wanton, reckless, or accidental, which would constitute an opinion as to the guilt or innocence of the defendant. *Stringer v. Commonwealth,* 956 S.W.2d 883, 889–90 (Ky.1997) ("Presumably, jurors do not need assistance in the form of an expert's opinion that the defendant is guilty or not guilty.").

See, *e.g., Bell v. State,* 435 So.2d 772, 775–76 (Ala.Crim.App.1983) (holding that it was not plain error to permit state forensic pathologist to characterize child's death as "homicidal murder" and not error of any kind to permit same witness to characterize death as "homicide"); *Smith v. State,* 276 Ga. 97, 575 S.E.2d 450, 452–53 (2003) (medical examiner properly permitted to express opinion that manner of death was homicide based on observations made during autopsy as well as facts obtained from other witnesses); *Medlock v. State,* 263 Ga. 246, 430 S.E.2d 754, 756 (1993) (medical examiner properly permitted to express opinion that manner of death was "homicide," though it would have been error if witness had expressed opinion as to whether homicide was intentional or accidental); *People v. Perry,* 229 Ill.App.3d 29, 170 Ill.Dec. 823, 593 N.E.2d 712, 715–16 (1992) (expert's opinion that manner of death was "homicide" not prejudicial where only issue was whether mother intentionally smothered child or accidentally rolled over on top of child while sleeping); *Booker v. State,* 270 Ind. 498, 386 N.E.2d 1198, 1202 (1979) (once trial court made preliminary finding that purse-snatching incident would have been a stressful event for the elderly female victim, doctor could properly express opinion that stress engendered by the robbery was a direct cause of victim's cardiac arrest, *i.e.,* that the death was a homicide); *State v. Young,* 662 A.2d 904, 907 (Me.1995) (medical examiner's opinion that manner of death was homicide was within witness's area of expertise and did not invade the province of the jury); *Schlossman v. State,* 105 Md.App. 277, 659 A.2d 371, 373 (1995) (medical examiner properly permitted to testify that cause of death was heart attack and that manner of death was homicide), *overruled on other grounds by Bailey v. State,* 355 Md. 287, 734 A.2d 684 (1999); *State v. Bradford,* 618 N.W.2d 782, 793 (Minn.2000) (medical examiner's opinion that manner of death was homicide was helpful to jury's determination whether fatal gunshot wound was self-inflicted or inflicted by another); *State v. Baluch,* 341 N.J.Super. 141, 185, 775 A.2d 127, 155 (2001) (medical examiner's testimony that manner of death was homicide "assist[ed] the jury in analyzing ... the sequence and severity of Imelda's various injuries and pneumonia relative to the cause of her death"); *Commonwealth v. Daniels,* 480 Pa. 340, 390 A.2d 172, 178–79 (1978) (where victim died of bronchial pneumonia after physical abuse consisting of holding his head under water and exposing him to cold weather, forensic pathologist properly permitted to express opinion that manner of death was "homicide," noting that homicide is a "neutral" term not always indicat-

ing criminal conduct); *State v. Washington*, 581 A.2d 1031, 1033 (R.I.1990) (where victim died of heart attack during course of rape, trial court did not abuse discretion in permitting medical examiner to characterize manner of death as "homicide," defined as "[t]he killing of one human being by the act, procurement, or omission of another"); *State v. Richardson*, 158 Vt. 635, 603 A.2d 378, 379 (1992) (upholding admission of medical examiner's opinion that victim died by homicide, noting that such did not amount to a comment on guilt or innocence); *State v. Scott*, 206 W.Va. 158, 522 S.E.2d 626, 632 (1999) (upholding admission of medical examiner's opinion that manner of death was homicide, noting that because "homicide can be committed without criminal intent and without criminal consequences[,] ... [t]he term ... is neutral [and] ... pronounces no judgment on its moral or legal quality").

The cases holding to the contrary are easily explained on their facts. *E.g., Maxwell v. State*, 262 Ga. 73, 414 S.E.2d 470, 473–74 (1992) (error to permit medical examiner to testify that manner of death was homicide where witness could not determine cause of death, relied solely on evidence of other lay witnesses, and admitted opinion was based on factors the jury could determine for themselves), *overruled on other grounds by Wall v. State*, 269 Ga. 506, 500 S.E.2d 904 (1998); *State v. Pinero*, 70 Haw. 509, 778 P.2d 704, 709 (1989) (error to permit forensic pathologist to express opinion that victim's death was a homicide and not an accident where defendant admitted that he fired the fatal gunshot); *State v. Vining*, 645 A.2d 20, 21 (Me.1994) (medical examiner's opinion that manner of death was homicide should have been excluded where opinion was based solely on information received from police and not on any physical evidence adduced during autopsy, thus not a product of witness's expertise); *State v. Flick*, 425 A.2d 167, 171 (Me.1981) (upholding exclusion of medical testimony as to defendant's state of mind at the time of crime); *State v. Jamerson*, 153 N.J. 318, 708 A.2d 1183, 1194–95 (1998) (forensic pathologist could not render opinion that vehicular collision was a homicide as opposed to an accident because pathologist was no more competent than the jury to determine cause of vehicle collision as opposed to physiological cause of death).

The consensus of these cases is that an expert medical examiner or forensic pathologist can express an opinion not only as to the cause of death, but also that the manner of death was homicide, *i.e.*, by the act or omission of another person, where such would not be readily ascertainable by a layperson, thus would assist that trier of fact in determining a fact in issue. However, the expert cannot express an opinion as to the mental state of the accused which would constitute an expression as to guilt or innocence, and cannot base the opinion solely on facts that are just as easily understood by a layperson.

Here, the decedent died of a heart attack. It would not be readily apparent to a layperson that the heart attack was a result of Appellant's physical and verbal altercation with the decedent as opposed to natural causes. Dr. Rolf only proposed to testify that the heart attack was a "homicide," indicating that it resulted from stress induced by the altercation with Appellant. The doctor did not propose to testify that Appellant intended the victim's death or that she wantonly, recklessly, or accidentally caused his death, thus did not propose to testify to Appellant's guilt or innocence. As noted by some of the cases cited *supra*, homicide is not always the result of criminal conduct. Killing in self-defense is not a crime. Unintentional killing is not a crime absent evidence giving rise to wantonness or recklessness. The

definition of wantonness (the mental state required for conviction of manslaughter in the second degree) would have required the Commonwealth also to prove that Appellant initiated the altercation and was aware of and disregarded a substantial and unjustifiable risk that the altercation would result in her father's death. KRS 501.020(3); *see Turner v. Commonwealth,* 153 S.W.3d 823, 827–28 (Ky.2005) (directed verdict of acquittal required where there was no evidence that defendant was aware of victim's heart condition, thus no basis for jury to find that she disregarded substantial risk that victim would suffer heart attack). For these same reasons, it would have been error to permit Dr. Rolf to identify the medical article upon which she partially relied for her opinion by its title, *viz:* J.H. Davis, *Can Sudden Cardiac Death Be Murder?,* 23 J. of Forensic Sci. 384 (1978).

GRAVES and ROACH, J.J., join.

Dissenting opinion by Justice JOHNSTONE.

In Kentucky, expert testimony is admitted at trial when it satisfies a four-part analysis set forth in *Stringer v. Commonwealth,* 956 S.W.2d 883 (Ky.1997), which incorporates, as part of that analysis, the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). To introduce expert testimony, the testimony must satisfy the following four requirements: (1) the expert witness must be qualified, (2) the subject matter must satisfy the requirements of *Daubert,* (3) the subject matter must satisfy the test of relevancy set forth in KRE 401, subject to the prejudicial versus probative balancing test required by KRE 403, and (4) the testimony must assist the trier of fact. *Stringer,* 956 S.W.2d at 891. Because it determines only that the expert testimony in this matter satisfies the requirements of *Daubert,* without any analysis of or reference to the *Stringer* requirements, I cannot join the majority opinion. Furthermore, having considered the record in its entirety, and having thoroughly reviewed the proposed testimony that Dr. Rolf delivered at the suppression hearing, I conclude that it fails to satisfy the requirements of *Stringer.*

During her testimony, Dr. Rolf presented the results of her autopsy of Price's body and explained that Price had suffered from cardiac disease during his life. She concluded that the medical cause of Price's death was a fatal cardiac arrhythmia, and that the manner of death was "homicide by heart attack." In explaining this conclusion, Dr. Rolf testified that she followed the criteria set forth in a 1977 article on "homicide by heart attack," to which she repeatedly referred during the hearing. The article lists the requirements as follows:

1. The *criminal act* should be of such severity and have sufficient elements of intent to kill or maim, either in fact or by statute, so as to lead logically to a charge of homicide in the event that physical injury had ensued.

2. The *victim should have realized that the threat to personal safety was implicit.* A logical corollary would be a feared threatening act against a loved one or friend.

3. The circumstances should be of such a nature as to be commonly accepted as highly emotional.

4. The collapse and death must occur during the emotional response period, even if *the criminal act had already ceased.*

5. The demonstration of an organic cardiac disease process of a type commonly associated with a predis-

position to lethal cardiac arrhythmia is desirable.

Dr. Rolf testified that she believed all of these criteria had been met in this case, and therefore concluded that Price died as a result of "homicide by heart attack."

This conclusion rested on several preliminary findings, which Dr. Rolf discussed extensively during her testimony. First, Dr. Rolf determined that Appellant committed a criminal act of such severity and nature so as to fulfill the first requirement of "homicide by heart attack." In addition to the contusions and abrasions on Price's body indicating a physical altercation, Dr. Rolf based this belief on information in the police reports and a tape recording of the 911 call contained in the police record. On cross-examination, though, Dr. Rolf acknowledged that Appellant's behavior might not be considered criminal if Price had initiated the altercation, and that she did not know for certain how the altercation commenced. Second, Dr. Rolf surmised that Price perceived an implicit threat to his personal safety. She testified that this was simply a common sense conclusion based on her understanding of the circumstances. Finally, Dr. Rolf concluded that the confrontation between Price and Appellant had been highly emotional. Again, she drew these conclusions based on information in the police reports indicating that Appellant and Price had been in a heated and physical argument.

Expert testimony is admissible only when it will "assist the trier of fact to understand the evidence or to determine a fact in issue." KRE 702. Here, Appellant was charged with murder. A person commits murder when "with the intent to cause the death of another person, he causes the death of such person or of a third person." KRS 507.020(1)(a). Though the fact of Price's death was not at issue, serious questions remained concerning Appellant's intent and whether her actions did, in fact, cause Price's death. In other words, causation was the central and determining issue in this case, and testimony as to whether the death was a homicide, accident, or suicide would assist the jury. Accordingly, the jury would need expert testimony concerning cardiac disease in general, and specifically the conditions under which extreme stress could induce a fatal heart attack so that a juror could determine whether another person caused Price's death. Thus, Dr. Rolf could properly testify that the autopsy revealed Price's cardiac disease, that he had died of a sudden cardiac arrhythmia, and that his body had numerous abrasions and contusions indicating a physical struggle.

However, by permitting Dr. Rolf to conclude that the manner of death was "homicide by heart attack" pursuant to the list provided in her journal article, the trial court allowed improper opinions that were beyond Dr. Rolf's area of expertise and that were not needed for the jury's understanding of the evidence. The jury did not require expert testimony to determine whether the altercation between Price and Appellant was highly emotional; testimony from the investigating officers and the 911 recording would have been sufficient evidence upon which the jury could base an informed decision. Likewise, Dr. Rolf's expert opinion was unnecessary to an intelligent determination as to whether Price did or did not perceive a physical threat that would induce stress. This question does not require specialized knowledge beyond the understanding of the average juror. Finally, Dr. Rolf's testimony that, in her opinion, Appellant's actions constituted a criminal act upon which to base a charge of homicide was undoubtedly beyond the area of her expertise; in fact, Dr. Rolf stated more than once her belief that this was "a question for the investigating

officers" and that she "wouldn't know" if Appellant's actions during the altercation constituted a criminal act.[1] These types of opinions are inadmissible as expert testimony, as they do not assist the jury in understanding the evidence or determining a fact in issue. The majority disregards this fundamental requirement.

The majority also concludes that Dr. Rolf properly based her testimony on "facts and data ... made known to the expert at or before the hearing," KRE 703(a), correctly noting that medical examiners regularly receive information from investigating officers that aid their inquiry and influences their medical conclusions. A review of Dr. Rolf's testimony, however, reveals that her testimony was not based solely on such information, but also on non-medical opinion. Dr. Rolf acknowledged that her conclusion that Price's death was a homicide rested, in part, on her assumption that Appellant had committed a criminal act by initiating the altercation. She even conceded that she might not have classified the death as "homicide by heart attack" if, for example, Price had initiated and escalated the conflict that later resulted in his fatal heart attack. Dr. Rolf then admitted that she had "assumed" Appellant had initiated the altercation but could not identify a single police report or record supporting this assumption, or disproving the possibility that Price had started the conflict. These assumptions, necessary to Dr. Rolf's overall conclusion that Price's death was a homi-

cide and not merely a heart attack resulting from a stressful situation, were simply expressions of Dr. Rolf's personal opinion and cannot be classified as facts or data regularly relied upon by medical examiners. By identifying the manner of death as "homicide," Dr. Rolf was implicitly testifying that Appellant had caused the death of Price, despite the fact that this conclusion was not based solely on her expert medical opinion or upon facts and data in police reports.

The most glaring omission in the majority opinion is its failure to consider the "prejudice versus probative" analysis required by *Stringer*. The classification of Price's death as a "homicide" is highly prejudicial in this case, especially when introduced in the form of expert testimony. KRE 403. An autopsy conclusion of homicide signifies that some human action caused injury to the victim and that the victim died as a result. *See* KRS 507.010. ("A person is guilty of criminal homicide when he causes the death of another human being ....") As the majority notes, Price's death is unlike a victim who has been shot or stabbed, where it is clear that a human being caused the victim's death. In such situations, an autopsy conclusion that the manner of death was homicide is not particularly prejudicial and is based solely on medical fact. However, the majority fails to take the analogy to its logical conclusion: in a case where the ultimate issue is whether human action caused a

---

**1.** The majority misconceives Appellant's argument on appeal that Dr. Rolf's testimony was improper because it included an opinion that a criminal act was committed in this case. *See* Op. at 315. The majority responds to this argument: "The term, homicide, of course, does not presuppose the occurrence of a criminal act, but simply refers to when a person causes the death of another human being." Appellant does not argue that the expert testimony was improper because it in-

cluded the opinion that the criminal act *of homicide* occurred; the majority confirms the obvious that "homicide" is not a crime. The argument is that the expert testimony was improperly based on the opinion that Appellant had committed a criminal act *by initiating the altercation* with Price. This, according to Dr. Rolf's testimony and referring to the 1977 journal article, is a necessary prerequisite to a conclusion that the manner of death was "homicide by heart attack."

death, expert medical testimony that conclusively answers this question but is not based solely on medical opinion is highly improper and prejudicial.

Instead, the majority concludes that this discrepancy renders Dr. Rolf's testimony even more necessary, stating that it is "axiomatic that a determination of the cause and manner which led to a person's death is generally scientific in origin and outside the common knowledge of layperson jurors." Op. at 315. The fact that jurors "usually" need the assistance of expert medical testimony in similar cases does not somehow relieve this Court of its duty to examine the specific facts and circumstances of this case or to review the actual proposed testimony. *See* Op. at 315, *citing Stringer v. Commonwealth,* 956 S.W.2d 883, 889–90 (Ky.1997). ("[Jurors"] usually do need the assistance of a medical expert in determining the cause of a physical condition . . . .) Nor does the fact that causation of death is at issue somehow open a floodgate to any and all expert medical testimony of whatever nature.

Here, Dr. Rolf's autopsy findings confirmed only that Price died of a heart attack; her conclusion that the death was a homicide incorporated not only objective data gleaned from police reports, but also her personal interpretation of that information.[2] The substantial weight that a jury places on expert medical opinion cannot be ignored, and the potential for prejudice resulting from improper expert testimony is great. Furthermore, this potential prejudice greatly outweighs the probative value of the testimony, precisely because, by her own admission, medical expertise was not needed to reach Dr. Rolf's conclusion that the death was a homicide. Once informed of the circumstances under which severe stress can hypothetically result in a heart attack, a reasonable juror is perfectly capable of determining whether one person's actions were sufficiently stressful and hostile so as to cause the other to suffer a heart attack.[3] The factors that led to Dr. Rolf's conclusion of homicide—the taped 911 call, the police reports—are factors well within the knowledge and understanding of the jury. Dr. Rolf's expert opinion as a forensic pathologist was simply not necessary to reach this conclusion, and to admit testimony that incorporates these types of non-professional opinions as expert is highly prejudicial. Inferences to be drawn from the testimony are a function completely within the jury's province, and the precise conclusions to be drawn from the evidence should never be presented to the jury in the form of expert testimony.

2. *See Medlock v. State,* 263 Ga. 246, 430 S.E.2d 754, 756–57 (1993). (Where an expert's findings as to cause of death "would have permitted the jury to find the death-causing injury either accidental or intentional . . . it would [be] impermissible for the expert to state his opinion that homicide was the cause of death.")

3. The majority's reliance on *Terry v. Associated Stone Co.,* 334 S.W.2d 926 (Ky.1960), to support a contrary assertion is curious. In that worker's compensation case, competing expert testimony as to what extent physical strain caused the claimant's heart attack was presented. Because all of the experts agreed that the physical exertion played some causative role in the heart attack, the Court concluded that the board's findings were based on substantial evidence and thus addressed only the issue of employer liability. The Court was not asked to determine whether the expert testimony was prejudicial because it incorporated personal opinion, precisely because the circumstances preceding the claimant's heart attack were not disputed. Here, of course, the circumstances surrounding Price's heart attack were very much in dispute.

By ignoring the "prejudicial versus probative analysis" required by *Stringer,* both the majority and concurring opinions fail to fully appreciate the impact of Dr. Rolf's testimony as it pertains to the particular facts of this case. When the entirety of Dr. Rolf's testimony is reviewed, it is evident that her testimony incorporated personal opinion, which is never the proper subject of expert testimony and which carries the danger of great prejudice. I find no error in Dr. Rolf's testimony that fatal heart attacks can be induced by high levels of stress, or in her testimony that Price died of a heart attack. I find it highly prejudicial, however, to permit a forensic pathologist to present expert testimony that Appellant did, in fact, induce this stress when such a conclusion is based on nothing more than her admittedly "personal" and "common sense" opinions of the circumstances preceding Price's death.

For the foregoing reasons, I respectfully dissent.

LAMBERT, C.J., joins this dissent.